**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

**AAFIA SIDDIQUI,**

                  Movant,

     -against-                       14 CV 3437
                                       (RMB)

**UNITED STATES OF AMERICA,**

                  Respondent.

-------------------------------------------------------------X

### MOTION TO VACATE SENTENCE PURSUANT
### TO 28 U.S.C. §2255

      AAFIA SIDDIQUI, by and through her attorney ROBERT J. BOYLE

hereby declares  as her Motion to Vacate pursuant to 28 U.S.C. §2255 as

follows:

    1.  This is a motion pursuant to 28 U.S.C. §2255 to vacate a judgment of

        this Court dated September 23, 2010 under Indictment 08-CR-826

        convicting movant Aafia Siddiqui of attempted murder of United States

        nationals in violation of 18 U.S.C. §2332(b); attempted murder of United

        States officers and employees in violation of 18 U.S.C. § 1114;  armed

        assault of United States officers and employees in violation of 18 U.S.C.

§ 111(b); discharging a firearm during a crime of violence in violation of 18 U.S.C. §924(c); assaulting United States officers and employees in violation of 18 U.S.C. § 111(a) (three counts).

2.  Dr. Siddiqui was sentenced to an aggregate term of 86 years imprisonment, five years supervised release and the mandatory $700 assessment.

3.  Trial counsel filed a Notice of Appeal. On November 5, 2012, the United States Court of Appeals for the Second Circuit affirmed the judgment of conviction and sentence in a reported decision and a non-precedential summary order. *United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012); *United States v. Siddiqui*, 501 F.App'x 56 (2d Cir. 2012).

4.  A petition to the United States Supreme Court for a writ of certiorari was denied on May 13, 2013. *Siddiqui v. United States*, 133 S.Ct. 2371 (2013).

5.  The allegations set forth herein are based upon personal knowledge, a review of the record, conversations with Dr. Siddiqui and current and prior counsel and independent investigation.

## STATEMENT OF FACTS[1]

### Introduction and Background.

6.  The instant Motion primarily presents issues arising from the denial of Dr. Siddiqui's right to counsel and to effective assistance of counsel as guaranteed by the Sixth Amendment.  Chief among them is that the trial court forced Dr. Siddiqui to be represented by attorneys that Dr. Siddiqui believed were not acting in her own interests.

7.  The attorneys, who were paid by the Government of Pakistan, were permitted to enter the case and manage Dr. Siddiqui's defense over her repeated objections.  In addition, the court permitted their representation without conducting a meaningful inquiry as to whether she would waive any actual or potential conflict of interest that might arise from that representation.

8.  Previously appointed CJA counsel advocated for third-party counsel's entry into the case.

---

[1] The facts adduced at trial will be set forth in this Petition only to the extent that they are relevant to the issues raised.  More complete, albeit disputed, statements of facts are set forth in the opinion of the United States Court of Appeals for the Second Circuit, the Court's decision denying Dr. Siddiqui's Fed. R. Crim. P. 29 motion and the respective briefs filed on direct appeal.

9.  As discussed *infra*, on several occasions during the course of the proceedings and in consensually monitored recordings, Dr. Siddiqui expressed her distrust of all current counsel.  This included expressing a belief that third-party counsel represented the interests of the Pakistani government, whom she believed may have played a role in her 2003 arrest and detention and her current situation.

10. Dr. Siddiqui was additionally denied her right to counsel and to effective assistance of counsel when the court refused her request for a continuance to retain counsel of her own choice after there had been a complete breakdown in the [non-existent] attorney-client relationship.

11. Dr. Siddiqui was denied effective assistance of trial and appellate counsel due to errors that are discussed *infra*.

12. Finally, the motion should also be granted on the ground that the government violated its duty to disclose exculpatory evidence in that it had in its possession information that would have verified Dr. Siddiqui's assertion that she had been abducted in 2003 and transferred to United States' custody.

13. Aafia Siddiqui was born on March 2, 1972 in Pakistan.  At a very young age she moved with her family to Zambia where her father worked as a

physician and her mother as a social worker. The family eventually returned to Pakistan. Dr. Siddiqui completed her secondary education in that country (T. 1695, PSR ¶ 56).[2]

14. Dr. Siddiqui was, by all accounts an excellent student. A caring person, she donated her time to others, particularly children of unfortunate means (PSR ¶ 58). In 1990, after graduating high school, Dr. Siddiqui came to the United States on a student visa and attended the University of Houston (T. 1697, PSR ¶). While there, she won an award for an essay describing how intercultural attitudes in the United States helped shape the world (A. Siddiqui: T. 1698).

15. Dissatisfied with Houston, Dr. Siddiqui transferred to the Massachusetts Institute of Technology (MIT). She obtained her Bachelor's Degree in biology from MIT in 1995 (Government Trial Exhibit 400 "G.Ex. 400"). In that same year, she married Mohammed Amjad Khan in a ceremony conducted over the telephone (PSR ¶ 60). Dr. Siddiqui applied for admission to a graduate program at Brandeis University and was admitted there in 1996.

---

[2] Numerals in parenthesis preceded by "T" refer to the trial transcript. All other proceedings and documents that are part of the trial record are referenced by date, subject matter and/or the document number given to it on the Court's docket sheet for the criminal case, i.e. 08-CR-862. Documents that were filed under seal are so noted.

16. At Brandeis, Aafia Siddiqui earned a PhD in neuroscience.  (G.Ex. 404). Although by many accounts Dr. Siddiqui was in an unhappy and abusive marriage, she continued to reside with her husband in the Boston area along with their two children Ahmed and Mariam (PSR ¶¶ 61-62). During that same period, she ran a pre-school program for under-privileged children out of her apartment (PSR ¶ 61).

17. In late 2002, Dr. Siddiqui left the United States and returned to her native Pakistan.  Now estranged from her husband, she gave birth to their third child, Suleman.  Her husband Khan remained in the United States.  The two were later divorced (PSR ¶¶ 62-63).

18. In or about March of 2003, Dr. Siddiqui left Karachi with her children intending to reach Islamabad to visit her uncle.

19. En route to Islamabad, Dr. Siddiqui was secretly taken into custody by Pakistani agents and separated from her three children.  She was drugged and taken to an undisclosed "black site" where she was illegally imprisoned.  She was repeatedly interrogated by Pakistani and foreign agents about her knowledge, if any, of individuals that her captors asserted were involved in acts of terrorism or planned acts of terrorism.

20. That Dr. Siddiqui was detained by officers of the Pakistani government is corroborated by contemporaneous news articles that quoted government sources.  The March 31, 2003 edition of the Pakistan News states that according to un-named sources, Aafia Siddiqui was taken into custody by "the sleuths of a sensitive agency" in Pakistan.  According to the article, she was spotted by a law enforcement agency at the Quaid-e-Azam airport, questioned by local investigators and then questioned by the FBI (Motion to Vacate, Exhibit E, hereinafter "Exhibit   ").

21. The Kuwait national News Agency Kuna issued a similar report on the same day.  An un-named "security official" of the Pakistani government told Kuna by telephone from Karachi that "Dr. Aafia Siddiqui, a PhD. doctor, was picked up from a house in downtown Karachi by the law enforcement agency."  Thereafter, she was taken to an "undisclosed location and "interrogated" by the local law enforcement agency and the FBI (Exhibit D).

22. The American media also carried the story.  On April 21, 2003, Lisa Myers, an NBC correspondent filed the following report that sired on the NBC Nightly News:

> A senior US official tells NBC News that Aafia
> Siddiqui, a 31-year old mother of three educated at
> MIT and Brandeis, tonight is in custody and being

questioned by Pakistani authorities about possible ties
to al-Qaeda....Senior U.S. officials say Siddiqui
definitely has ties to very radical individuals in
Pakistan and may be working as a fixer for al-
Qaeda...

(Exhibit F).

23. An FBI spokesperson later denied that Dr. Siddiqui was in custody.  But

Myers told *Harper's* Magazine in 2009 that it was her belief that the

retraction was made not because the story was false but because her

source "had spoken out of turn."  See "The Intelligence Factory" by

Petra Bartosiewicz, *Harper's Magazine*, November 2009.

24. Additional evidence that Dr. Siddiqui was abducted by Pakistani police

surfaced after the instant trial.  In April 2010, Syed Bilal, an American

citizen residing in Texas, had two conversations, one recorded, with

Imran Shaukat, a present and former police official in Pakistan, when the

latter was visiting Texas.  Shaukat told Bilal that he personally

participated in Dr. Siddiqui's March 2003 arrest.  He additionally told

Bilal that Dr. Siddiqui was eventually handed over to American agencies.

The details of Bilal's conversations with Shaukat are discussed *infra*.[3]

---

[3] An affidavit from Mr. Bilal is filed in support of this motion.  Attached as Exhibit 1
to his affidavit is the transcript of his secretly recorded conversation with Imran
Shaukat.

25. Dr. Siddiqui was in the custody of Pakistani and/or American security forces for five years, i.e. from March 2003 until her "release" in July 2008.  During that time, she was subjected to physical and psychological torture and was separated entirely from her three children.

26. On a day in July, 2008, Dr. Siddiqui was placed on a public bus by her captors.  She believes she was administered some type of drug as she could not think clearly and was in a daze.  At the bus, she was reunited with her son Ahmed.  Being in a daze and having not seen the boy for five years, Dr. Siddiqui was unsure that he was really her son.

27. Dr. Siddiqui disembarked from the bus in the Afghan city of Ghazni. It was now July 17, 2008.  Unsure of her whereabouts, she looked for and found a mosque where she could pray.  As it got later into the day, she and Ahmed came to the attention of the local police when they were observed by local villagers wandering near the mosque and unable to communicate in the local language.  She and Ahmed were detained.

28. Communications with Dr. Siddiqui were hampered by the fact that Afghan police did not speak Urdu, her native language.  Over the course of questioning, it was alleged that she dropped certain materials and documents that she had been carrying.

29. The nature and significance of these documents was subject to much dispute at trial. But there was no proof that Dr. Siddiqui planned to carry out a terrorist act on that day or indeed in the future. The Afghan police contacted United States' officials as some of the documentary material was in English and described certain locations within the United States. American personnel requested and were later granted the opportunity to interrogate Dr. Siddiqui.

30. That permission was not granted until the afternoon of July 18, 2008. By this time, Dr. Siddiqui had been moved to a room on the second floor of the Afghan National Police Headquarters in Ghazni. The room was divided by a yellow curtain. At about 2:30 P.M., a group of about eight FBI agents, US soldiers and their interpreters entered the room in anticipation of Dr. Siddiqui's interrogation.

31. Government witnesses later testified that Dr. Siddiqui reached from behind the curtain, grabbed an M-4 rifle and fired two to four shots toward the officials. Aafia Siddiqui denied that she touched the rifle, let alone fired it. Rather, she testified that when she peeked into the side of

the room where the officials were she heard someone say "she's loose." She heard gunfire, was shot in the abdomen and collapsed.[4]

32. Dr. Siddiqui received emergency medical care in Ghazni.  She was then transported to the U.S. military hospital in Bagram.  For the 16 days that she was at the hospital in Bagram, Dr. Siddiqui was kept in a hospital bed in four point restraints.  While tied to the bed and heavily medicated, she was questioned by an FBI agent for hours each day.

33. The government alleged that Dr. Siddiqui made inculpatory statements during those interrogations and also stated that she had been in "hiding" during the missing five years.  Dr. Siddiqui was heavily sedated at the time but denied making such statements.  The alleged statements were not electronically recorded.

**The Criminal Proceedings And Denial Of Right To Counsel**

      **Pre-Trial Proceedings**

34. On or about August 4, 2008, Dr. Siddiqui, while still recovering from gunshot wounds, was transported to the United States to face the criminal charges arising out of the July 18, 2008 incident in Ghazni.  She was taken to the Metropolitan Detention Center ("MDC") in Brooklyn

---

[4] Further details of the shooting will be discussed *infra*.

and placed in their high-security unit.  Locked in her cell 24 hours per day, her only contact with the outside world (other than cursory contact with attorneys) was one fifteen-minute telephone call per month.

35. On or about September 2, 2008 a seven count indictment was returned charging Dr. Siddiqui with two counts of attempted murder, one count of armed assault, one count of discharging a firearm and three counts of simple assault.  The Honorable Richard M. Berman was assigned to preside over the case.  At the initial court appearance, Elizabeth M. Fink, Esq. was appointed to represent Dr. Siddiqui pursuant to the Criminal Justice Act.

36. September 23, 2008 was set for the arraignment.  Dr. Siddiqui did not appear, having refused on religious grounds to submit to a strip search. The arraignment proceeded in her absence.  Ms. Fink expressed her belief that Dr. Siddiqui was not competent to stand trial and that her deteriorated mental state was likely caused by the five years that she had been in custody (T. 9-23-08, p. 10).

37. The Court entered a "not guilty" plea on Dr. Siddiqui's behalf.

█ Dr. Siddiqui desired to secure an attorney who was, like her, a Muslim who could understand her plight.  ███████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████████████

██████

██ Shortly thereafter, Dr. Siddiqui was transferred to the Federal Medical

Center in Carswell, Texas for a court-ordered competency evaluation.

Her efforts to obtain acceptable counsel continued. ████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████

---

[5] Exhibit A to this Motion consists of the transcripts of recorded telephone calls made by Dr. Siddiqui while incarcerated at FMC Carswell and MDC Brooklyn.  They were produced by the government in discovery with Bates numbers in the lower right corner.   The page number in the Exhibit A reference refers to the Bates number and not the page number of the individual conversation. Exhibit B is a recorded conversation on September 4, 2009.  It was not Bates stamped and is therefore in a separate Exhibit.  Both Exhibits A and Exhibit B were produced subject to protective order and accordingly are filed under seal.

40. Dr. Siddiqui was made aware that her case had attracted widespread international attention, particularly in Pakistan.  In response, the Government of Pakistan had indicated that it might be willing to help her in some way.  During the next several months, Dr. Siddiqui had one visit with Pakistani Senators and had a few conversations with Embassy personnel.

41. Dr. Siddiqui appreciated their interest.  However, she increasingly grew frustrated at the lack of results and concrete steps to secure her return to Pakistan.  This led to distrust. ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
██████████████

 Dr. Siddiqui's distrust grew further. ███████████████

44. On November 17, 2008, medical personnel at FMC Carswell issued a
report finding Dr. Siddiqui psychologically unfit to stand trial as she was
suffering from severe Post-Traumatic Stress Disorder as a result of prior
torture and abuse and concern for the safety of her children.

45. Two days later, a conference was held before the Court in the Southern
District of New York.  Dr. Siddiqui was not present, as she remained in
Carswell.  The Report was addressed.  The Court emphasized two
matters that it felt would influence Dr. Siddiqui's course of treatment
and, ultimately, her fitness to stand trial:  1) determining the facts
surrounding her whereabouts during the years 2003 to 2008 and 2)

---

[6] Some of the Government's transcripts contain the translator's comments.  The term
"TC" in brackets identifies those comments.

locating her two missing children from whom she was separated in 2003.[7]  (T. 11-19-08, p. 3-4).  It asked the parties to address both matters.

46. The prosecutor acknowledged that according to 2003 news reports in Pakistan, Aafia Siddiqui had, in fact, been abducted and was presumed to be in United States' custody.  But the government disputed those reports.  It represented that it had no "hard" evidence about Dr. Siddiqui's whereabouts for the five-year period.  The evidence it did have, the government claimed, was classified.  (*Id.* at 7-10).

47. The government also moved to controvert the Carswell competency Report.  Dr. Siddiqui was again evaluated, this time by physicians retained by the government.



---

[7] Dr. Siddiqui's eldest child, Ahmed, was with her at the time of her July 17, 2008 arrest in Ghazni.  He was eventually placed in the custody of Dr. Siddiqui's family.



51. At about the same time, attorney Elizabeth Fink filed a motion to withdraw as counsel for Dr. Siddiqi for health reasons. The court then appointed Dawn Cardi, Esq. pursuant to the Criminal Justice Act.

52. Ms. Cardi first appeared in court on behalf of Dr. Siddiqui on February 23, 2009. By that time, the two psychiatrists retained by the prosecution had examined Dr. Siddiqui at Carswell and concluded that she did not suffer from the type of mental defect that would prevent her from participating in her own defense (T. 2-23-09, p. 4-5).

█████ Dr.  Siddiqui did not accept Ms. Cardi as her attorney.  She made clear to anyone that would listen that only she, and no third party, could choose her attorney. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████████

██████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████

██████████████████████████████

██████████████████████████████



58. Muhammad Siddiqui had orally learned that the Government of Pakistan might be willing to retain lawyers in about June of 2009.

59. He consulted with the Muslim Legal Fund of America and came up with a list of possible attorneys from which he selected Charles Swift and Linda Moreno.  He also recommended that Elaine Sharp be part of the team as Aafia Siddiqui knew of her and might feel more comfortable if she were part of the defense.

60. Mr. Siddiqui made clear, however, that the family would only support the arrangement if the recommended attorneys were capable of representing Dr. Aafia and have her confidence (Exhibit C, p. 2).

61. A meeting was held with the Ambassador at the Pakistani Embassy in Washington, D.C.  In addition to Muhammad Siddiqui and the Ambassador, Charles Swift and Linda Moreno were present.  At the conclusion of that meeting,  the Ambassador expressed his opinion that Ms. Moreno be lead counsel.

62. Neither Muhammad Siddiqui nor anyone in his family participated in the ensuing financial negotiations between the attorneys and the Pakistani government.

63. Those retainers, which were later reviewed by the court, provided that Mr. Swift, Ms. Moreno and Ms. Sharp would each be paid Five Hundred Thousand Dollars ($500,000) to represent Aafia Siddiqui at the trial level through, if necessary, sentencing.  An additional $500,000 would be set aside for investigation and experts.  The Government of Pakistan and the attorneys agreed that they would represent Aafia Siddiqui's interests only.  However, Dr. Siddiqui was never consulted about the terms of the arrangement nor shown a copy of the retainer agreement.

64. Contrary to Muhammad Siddiqui's understanding, the agreement was not made contingent upon Aafia Siddiqui's consent to have the three attorneys enter the case and represent her.

65. On August 11, 2009, attorney Charles Swift sent a letter to the Court informing it that the three attorneys, Linda Moreno, Elaine Sharp and Mr. Swift himself, were being retained by the Pakistani government pursuant to the Vienna Convention to represent Aafia Siddiqui (Document # 76).[8]

66. Mr. Swift represented that the arrangement was with the consent of the Siddiqui family.

67. It was further represented that Aafia Siddiqui had been made aware of the retainer during a telephone conversation with Elaine Sharp. According to Ms. Sharp, Dr. Siddiqui reaffirmed her rejection of previously assigned CJA counsel (i.e. Dawn Cardi, Esq.).  Ms. Sharp represented to the court that while Dr. Siddiqui did not "expressly oppose" the newly retained attorneys, she did not assent to them either.

---

[8] Article 36 of that treaty provides in relevant part that "counselor officers shall have the right to visit a national of the sending state who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation….Nevertheless, consular officers shall refrain from taking any action on behalf of a national who is in prison, custody or detention if he expressly opposes such action."  Vienna Convention on Consular Relations, art. 36(1)(c), Apr. 24, 1963, 596 U.N.T.S. 261

████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████████████

69. Defense counsel opposed any inquiry, arguing instead that Aafia Siddiqui suffered from a severe mental disorder and could not make a decision in her own self-interest.  Counsel stated that they were "compelled" to "take protective action on her behalf" (Document # 81).

70. Counsel Moreno expressed her own thoughts on the issue in a letter dated August 20, 2009. Ms. Moreno further clarified the terms of counsels' agreement with the Government of Pakistan, noting that the agreement provided that it was exclusively for the benefit of Dr. Siddiqui.  The letter did not state whether Dr. Siddiqui herself had agreed to counsels' representation (Documents # 85, 87).

71. Aafia Siddiqui did in fact "expressly oppose" the new attorneys on the very next court date, September 2, 2009.  The court first addressed the relatively unusual situation before it and whether CJA counsel should remain as "lead" counsel.  Mindful of the court's schedule, Ms. Moreno assented to that suggestion.  No one, however, sought Dr. Siddiqui's consent.  She then interjected:

THE DEFENDANT: Excuse me sir, I don't agree with that.  I don't agree with the team you are putting together for me and the consulate had no right to do that.  I never gave anybody that right and I already requested Ms. Cardi to please leave this case last time, clearly.

(T. 9-2-09, p. 7).

72. The court told Dr. Siddiqui that she could retain other counsel.  She replied:

I'm not – where I am I can't find my own counsel you put me in such conditions.  I'm sorry I just don't agree with anyone that's provided.  You can't just impose people and say do that…

They are not my attorneys.

(*Id.* at 8, 9).

73. The government urged the court to conduct an inquiry under *Curcio*. The court declined, indicated that it was comfortable proceeding without any inquiry and turned its attention to the jury questionnaire.   The government re-raised the issue.  It argued that Dr. Siddiqui's objection to the new counsel paid by a third party warranted, at a minimum, some sort of inquiry (*Id.* at 17).

74. Counsel Cardi objected to any inquiry.  She noted that it is relatively common for third parties to pay for lawyers, likening the instant situation to payment by a defendant's family, ignoring, of course that Dr.

Siddiqui had now expressly refused the counsel provided by the third party (*Id.* at 18).

75. Implying that any error would likely be deemed harmless, counsel Cardi stated that she "[could not] imagine any Court reversing a case based on Sixth Amendment grounds because Ms. Siddiqui -- Dr. Siddiqui had too many counsel" (*Id.* at 19).

76. The court stated that there was no other option presented about counsel. In response, Dr. Siddiqui stated "How about letting me find one?", clearly referring to another attorney.  That request was ignored by all (*Id.* at 20).  Indeed, when the court asked counsel whether they wanted to hear further from Dr. Siddiqui, Ms. Cardi replied, "No, Your Honor.  I think we have heard from her," and Ms. Moreno added, "Agreed, Your Honor."  (*Id.*).

77. Later, the court did ask Dr. Siddiqui whether she had an alternative plan. She again replied, "How can I when I am locked up not able to make a phone call or talk?"  She added that she would like an attorney that would facilitate a meeting with the government (*Id.* at 21-22, 31).

78. On September 2, 2009, the same date as the court appearance, Dr. Siddiqui sent a letter to the court.  In it, she repeated the sentiments that she had expressed in court.  She also told the court, in no uncertain terms: "I would like to relieve Ms. Dawn Cardi and all my other

"counsel" from representing me." (Letter of Aafia Siddiqui dated September 2, 2009 quoted in Government's September 11, 2009 letter).

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]





83. In a letter filed the same date, the government again urged the court to conduct an inquiry of Dr. Siddiqui pursuant to *Curcio*.  Should that inquiry establish that Dr. Siddiqui continued to reject current CJA and third-party counsel, the government argued, the court should determine whether new counsel should be appointed and/or give Dr. Siddiqui to retain new counsel (Government letter dated September 11, 2009).

84. A conference was held on September 23, 2009.  Dr. Siddiqui was not in attendance, as she objected to and refused to participate in a strip search (T. 9-23-09, p. 1).  The Court found no need for an inquiry of Dr. Siddiqui, concluding that counsel paid by the Pakistan government were not operating under an actual or potential conflict.  All counsel stated that they would pursue any strategy that was in Dr. Siddiqui's self-interest, including plea negotiations (*Id.* at 13-19).

85. Defense counsel went on to suggest that Dr. Siddiqui was delusional, with counsel Swift adding that her dismissal of counsel was not motivated by a rejection of them but a desire to meet with the government (*Id.* p. 23).

86. On October 4, 2009, Dr. Siddiqui sent a letter to the Court.  In it she once again dismissed counsel, although she named only two of them, Dawn Cardi and Charles Swift (Document #117).  In response, the court issued an order requiring the defense counsel to consult with Dr. Siddiqui concerning any alternative plans for counsel.  It also requested all parties to draft proposed allocutions on the counsel issue.

87. By letter dated October 27, 2009, attorney Dawn Cardi informed the court that Dr. Siddiqui did not have a proposal as to who would represent her at trial (Document #118).

88. Aafia Siddiqui and all counsel were present for the next conference, on November 3, 2009.  The court stated for the record the contents of Dr. Siddiqui's October 4 note dismissing counsel.  It then sealed the courtroom and conducted an *ex parte* proceeding with Dr. Siddiqui and defense counsel without representatives of the government (T. 11-3-09, p. 5-9).













[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

103.    The court then resumed the public portion of the proceedings.  It placed certain findings on the record but did not mention that Dr. Siddiqui, at the close of the sealed portion, had stated that she continued to "hold" her previous position concerning counsel (*Id.* at 71-73).

104.    In response to an inquiry from the government, the court stated that it had asked "most" of the questions proffered in their letter (*Id.* 80-81).  When the government later asked the court whether it had determined that there was not a breakdown in the attorney-client

relationship, the court said that there hadn't been.  Dr. Siddiqui objected,
stating that just because she talks to someone it does not mean that there
was an attorney-client relationship (*Id.* at 86).

105.     Finally, Dr. Siddiqui asked the court whether it was denying her
request for time to seek counsel.  Dr. Siddiqui stated that during the
proceeding, she had stated that if she was given time she might be able
to find an attorney.  "I said there wasn't enough time because we have a
trial." (*Id.* at 90).

106.     The court responded that while it would entertain any application
Dr. Siddiqui might make, "the flip side of that is also true, that there is
no plan option B alternative for other lawyers today."  (*Id.*).

107.     On November 10, 2009, the court issued an order wherein it
directed to meet with Dr. Siddiqui to ensure that all legal options,
including cooperation with the government, had been pursued.  On the
same date, the court issued its "Findings of Fact and Conclusions of
Law" denying substitution of counsel and concluding that none of Dr.
Siddiqui's options had been foreclosed by the counsel arrangement
(Document #122).



### Dr. Siddiqui's Continued Rejection Of Appointed And Third-Party Counsel At Trial.

109.     Trial commenced with jury selection on January 13, 2010.  On certain occasions, Dr. Siddiqui spoke out in front of the jury, stating, *inter alia* that defense counsel were not her attorneys and not putting on a true defense.  In response, the government requested that the jury be told that Dr. Siddiqui's comments were improper and could not be considered as evidence.  Part of the proposed instruction involved telling the jury that Dr. Siddiqui could testify if she chose to.

110.     Hearing that, Dr. Siddiqui stated

Can I testify?  Can I testify? I would like to.

THE COURT: Of course you can.  You have to talk with your lawyers about when and how.

THE DEFENDANT: They're not my lawyers.

…

I said since you forced me to come and since I never get a turn to say anything and these people are not my attorneys, I never accepted them for a day.  I relieve then again one more time from my service…

(T. 330, 331).

The court told Dr. Siddiqui that she could exercise the option of viewing the in-court proceedings on a video monitor with one of her counsel, such as Elaine Sharp, present.  Referring to defense counsel, Dr. Siddiqui stated, "I don't look at them, talk to them, I don't want them."  (T. 342).

111.    The court reminded Dr. Siddiqui that at least four of her lawyers had been retained "at great expense" by the Government of Pakistan.  Dr. Siddiqui responded that she did not want them because they were representing others' interests and not her own:

> THE DEFENDANT: The defense, whatever, you call them.  I don't consider them.  They are people, respected people, but they're not –
>
> THE COURT: They certainly are.  They are respected lawyers.
>
> THE DEFENDANT:  But they are not representing me.
>
> THE COURT: OK, but I just want you to understand, at least four of whom have been retained by the government of Pakistan.
>
> THE DEFENDANT: Yes, but you insist to keeping them.  I have the right to relieve them.
>
> THE COURT: -- at great expense.

THE DEFENDANT: But I have relieved them many times. I do not want them. <u>They are respectfully working for other respectful people, not me.</u>

THE COURT: We went through that many times on the record about your representation –

THE DEFENDANT: So—

THE COURT: And it is very clear to me that you were given every opportunity to –

THE DEFENDANT: No, I was not. Carsell (sic), they strip search. And they would do that if a revelation came to me about a certain lawyer, which it doesn't happen that way. That is not true. That I disagree.

(T. 347-48) (emphasis added).

112.   Communication between Dr. Siddiqui and the assigned lawyers did not improve and counsel acknowledged that they had virtually no interaction with her. At one point, counsel moved for a mistrial after Dr. Siddiqui was removed from the courtroom in an aggressive manner in front of the jury. The court denied the motion. It urged counsel to spend more time with Dr. Siddiqui in order to persuade her to follow appropriate in-court protocols.

113.   In response, attorney Linda Moreno stated:

Your Honor, Dr. Siddiqui doesn't communicate with defense counsel. She doesn't talk to us  Just today I went back there to speak to her to try to explain some things to her, she indicated that if I didn't leave immediately, she was going to accuse me of

harassment.  She does not confer with the defense counsel.  Again we would urge the Court that we believe most sincerely, this is an Edwards issue and that this is going to come up again in the future applications to the Court.

(T. 1156).

114.      On the following day, the government moved to have Dr. Siddiqui permanently barred from the courtroom and to proceed in her absence. The court denied the motion but in doing so, put, *inter alia* the following on the record:

>The courtroom is open to everyone so long as they adhere to simple rules of decorum.  Dr. Siddiqui – who has the presumption of innocence – has, as you all know, in the past received at the defense and the government's requests a thorough hearing on competence; and competence having been determined, she has been given every conceivable opportunity to mount a full defense.

>She has by my count some six to eight very skillful attorneys, a dream team if you will, at almost limitless expense.  Some of her counsel are paid for by the government of Pakistan – I'm pretty sure I read somewhere that it was up to the tune of $2 million – and other of them are paid for by the United States. They have been afforded, in my judgment, every opportunity to mount their defense, including among other things, one or more trips to Afghanistan for depositions, retention of expert witnesses, etc. Just what one might expect in a criminal trial such as this.

115.     (T. 1167).  The court further stated that Dr. Siddiqui had tried to have it "both ways" in that she had consulted with Elaine Sharp on occasion and attended certain side bars during jury selection (T. 1168).

116.     At the conclusion of the court's remarks, the following occurred:

THE COURT: Dr. Siddiqui?

THE DEFENDANT: Sir, I respectfully state that you are lying.

THE COURT: Ok, anything else?

THE DEFENDANT: In everything you said.

THE COURT: Anything else?

THE DEFENDANT:  No, I just have to say that.

(T. 1168).

117.     On January 27, 2010, the Honorable Hussain Haqqani, the Ambassador of Pakistan to the United States, was present in court.  The court placed that fact on the record, noting that it had met briefly with Ambassador Haqqani before the start of the proceedings (T. 1406).  Neither Dr. Siddiqui nor counsel were present during that meeting.

███████████████████████████████████████

███████████████████████████████████

[redacted]

[redacted]

[redacted]

[redacted]







[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Dr. Siddiqui's Trial Testimony**

127.       Dr. Siddiqui took the stand and testified after about 30 minutes of preparation.  None of that preparation involved a discussion of her abduction in 2003, the separation from her three children, her five years in custody, her release onto the streets of Ghazni on July 17, 2008 or her reunion with her son Ahmed.

128.       Dr. Siddiqui described her upbringing in Zambia and Pakistan and her 1990 admission to the University of Houston in Texas.  In 1992, she transferred to and eventually graduated from the Massachusetts Institute of Technology (MIT).  While at MIT, she won several academic and public service awards and worked with the noted linguist Noam Chomsky (T. 1699-1706).  Upon graduation from MIT, Dr. Siddiqui entered Brandeis University, eventually earning a PhD in neuroscience (T. 1702-04).  After earning her doctorate, Dr. Siddiqui remained in the United States and worked with disabled children.  While still in the United States, she married and gave birth to two children.  She gave birth to a third child Suleman after her return to Pakistan some time in 2002 (T. 1708, 1724).

129.       Counsel Sharp posed no questions about the years 2003-2008. Rather, she moved directly from 2002 to the events of July 18, 2008.

After an initial reluctance, Dr. Siddiqui did answer counsel's questions and described it for the jury. She testified that she was in a room divided by a curtain and was tied to a bed inside it. She complained to her captors that the restraints were so tight that circulation to her hands was being cut off and they were turning blue. The cuffs were then removed (T. 1713).

130.    From behind the curtain, Dr. Siddiqui heard the voices of Americans and Afghans. Frightened that she might be placed in American custody, she rose from the bed. She peeked out to the other side from the end of the curtain, hoping to see a means of escape. At that point, someone shouted "she's free" or "she's loose." She heard the sound of gunfire and was shot in the abdomen (T. 1715-17, 1734-35, 1739). Dr. Siddiqui could not describe the exact position she was in when shot. Nor could she state exactly from where the shots came (T. 1739-42).

131.    Dr. Siddiqui remembered little of what happened after she was shot. She did recall being in the operating theater in Bagram hospital. She testified that she never picked up a rifle or fired shots when inside the room in Ghazni and denied that she ever told anyone that she did (T. 1720-22, 1742, 1746-47).

132.     On cross examination, it was the government that elicited and attempted to elicit details from Dr. Siddiqui about her whereabouts in the years 2003-2008.  Not long after cross examination began, the government asked Dr. Siddiqui whether the young boy she was found with on July 17, 2008 was her son, a circumstance not elicited on direct.  Dr. Siddiqui replied that she could not say for sure because she was in a daze, had been drugged, and had been separated from her children for a long time (T. 1726-27).  The prosecutor then posed questions to Dr. Siddiqui that went directly to her whereabouts during those years:

> [MS. DABBS]: Isn't it true that while you were at Bagram you told Special Agent Sercer a number of times that you had been in hiding for several years?
>
> [THE DEFENDANT]:  I never, I was under the impression that these because before I was brought before they rearrested me, Americans, it was standard practice of the people who were keeping me, they were also Americans, they looked like Americans, they poke like them.  I call them fake Americans.
>
> MS. SHARP: Your Honor.
>
> [THE DEFENDANT]: But what they were doing for so many years was giving me information, telling me this is just a game, you are not the only one, doctor, who ever
>
> MS. SHARP: Objection.
>
> [THE DEFENDANT]: We know how to do experiments on you and they would tell me

information and then make me repeat it in front of a
different group of people who would interrogate me
question me repeatedly hundreds of times.  So if I
messed up it was like torture.  I thought it was the
same game.

THE COURT: The Objection is sustained.  We will
strike this.

MS. SHARP: No, Your Honor.  I move for a mistrial
on the grounds that the government has elicited the
last five years and denied us classified information.

(T. 1760-61).

133.     Although the door was opened by the government's questioning,

defense counsel did not elicit, on re-direct examination, any details from

Dr. Siddiqui about her experiences during the years 2003-2008.

134.     Counsel did, however, know about those experiences.  In the

months immediately following her August 2008 transfer to the United

States, Dr. Siddiqui was interviewed by attorneys Elizabeth M. Fink,

Gideon Oliver and Elaine Sharp.  During the course of those interviews,

Dr. Siddiqui provided an account, as best as she could remember, of

those five years and the treatment to which she was objected.

135.     In addition, news agencies reported in 2003 that Aafia Siddiqui

was in United States' custody and was being questioned by the FBI

about alleged ties to *al-Qaeda* (See Exhibits D and E).  A NBC News

Report even attributed information about Dr. Siddiqui's detention to "government" sources (See Exhibit F).

136.    The government represented that it had no "hard" evidence that Dr. Siddiqui had been abducted and/or held in government custody for those five years.  Any other evidence that it had, the government stated, was "classified" (T. 11-19-08, p. 7-10).  ████████████████

████████████████████████████

████████████████

## The Shooting Incident "Eyewitness" Accounts

137.    The government presented nine witnesses who claimed to be present inside the room where the shooting incident occurred.  Eight testified in person at trial:  FBI Agent John Jefferson, Interpreter Ahmad Gul, Robert Snyder, the "Chief Warrant Officer" (hereinafter CWO), Dawn Card, FBI Agent Erik Negron, Interpreter Ahmed Amin and Lamont Williams.  The testimony of an additional prosecution witness, Mr. Basire, was memorialized via a Fed. R. Crim. P. 15 deposition.   The defense presented two witnesses, Qadeer, who testified pursuant to Rule 15 deposition and the defendant herself, Dr. Aafia Siddiqui.[9]

---

[9] Dr. Siddiqui's testimony regarding July 18 is summarized *supra*.

138.     The trial testimony of the government witnesses contained

material inconsistencies both internally and with each other.   The Chief

Warrant Officer testified that after entering the room and moving

toward the curtain, he pulled the curtain back and looked around for a

couple seconds.  He claimed that he saw no one (T. 1072-73).   Erik

Negron observed the CWO peek behind the curtain, as did FBI Agent

John Jefferson and Williams (T. 1174, 292, 1332).  Jefferson added that it

appeared to him that the CWO was "clearing the room" (T. 292).

Interpreter Ahmed Gul testified at trial that the CWO never moved the

curtain but acknowledged that his initial statement to the FBI claimed

that he observed the CWO "check" behind it (T. 462, 464).   Both

Qadeer and Basire testified that they saw one of the American soldiers,

probably the CWO, not only look behind the yellow curtain but

physically walk behind it (Document # 249-2, p. 13; T. 1808).

139.     The CWO testified that after looking behind the curtain, he

removed his rifle, sat down and placed the rifle against the wall (T.

1074).  Captain Snyder, Ahmed Amin and Erik Negron testified that

they saw the same thing (T. 203-04, 1269, 1177).

140.     Dawn Card, on the other hand, testified that it was Captain

Snyder who removed his M4 and placed it against the wall (T. 967).  In

fact, she had no recollection of the CWO having an M4 at all that day. She added that she was told by Sergeant Baker that Snyder would be fired if it came out that Dr. Siddiqui had picked up his M4 but that the CWO would not get into trouble.  At trial, Card testified that she could not remember making that statement to the FBI (T. 988-90).

141.     The Afghan police witnesses, Qadeer and Basire, testified that at least two and as many as four of the Americans removed their rifles and laid them against the wall (Document # 249-2, p. 12; T. 1808).

142.     Both Qadeer (a defense witness) and Basire (a prosecution witness) testified that they heard shots fired only moments after the American soldier went behind the curtain (Document # 249-2, p. 13; T. 1809).  They did not mention hearing a woman or anyone else say anything prior to the shots.  According to both, Dr.  Siddiqui never emerged from behind the curtain and neither saw her holding, let alone firing a weapon (Document # 249-2, p. 12; T. 1809).

143.     Among the other prosecution witnesses who claimed that Aafia Siddiqui did fire a weapon, there were a variety of accounts.  For example, Snyder testified that just prior to hearing shots, he heard a female voice say "May the blood of [something] be on your [head or hands]" (T. 165).  The CWO claimed the woman shouted "Allah

Akbar!" T. 1077  The translator Ahmed Amin heard a female voice shout "Get the fuck out of here" (T. 1270).  He denied that she said anything like "Allah Akbar" or "Death to Americans" (T. 1291-92). Other than medic Dawn Card, Dr. Siddiqui was the only female in the room.

144.    The CWO testified that he was unsure if he first observed Dr. Siddiqui holding his M4 and pointing it toward people in the room, or if he actually observed her grab his M4 (T. 1105-06).  But in pre-trial statements, he wrote that he observed the woman lunge for the M4 and made a conscious decision to let her have it as he transitioned to his pistol (T. 1103-04).  None of the other government witnesses – Snyder, Jefferson, Gul, Card, Amin, Negron or Basire – saw Aafia Siddiqui grab the M4.  Snyder, Gul and Card testified that when they first saw Dr. Siddiqui, she was already holding the weapon (T. 166, 427, 967).

145.    The CWO claimed that having grabbed the M4, Dr.  Siddiqui stood "in an aggressive stance" (T. 1079).  Card, too, stated that Dr. Siddiqui was standing in the area where the curtain met the wall as she allegedly fired the shots (T. 967-68).  Snyder, however, testified that when Dr.  Siddiqui was allegedly firing, she was kneeling on the bed with both knees (T. 166).  Gul, on the other hand, testified that as the shots

were being fired, Dr. Siddiqui was standing next to the edge of the bed, some three feet behind the curtain (T. 433-34).

146.     The witnesses testified that between two and four shots total were fired (Document # 249-2, p. 14; T. 208, 298, 427-28, 1082, 1181, 1292-93, 1336, 1809). Card claimed that she observed Dr. Siddiqui fire the rifle down the row of officers. A bullet flew past her, striking the wall and causing parts of it to crumble (T. 968-69). Several of the witnesses claimed that they could discern that a rifle was fired in addition to a pistol (T. 168, 298, 1336-37).

**Holes In The Wall**

147.     It was the prosecution's theory that Dr. Siddiqui picked up the M4 rifle and fired at least two, but possibly as many as four rounds into the side of the room where American and Afghan personnel were gathered.  No physical evidence supported that theory.  No one other than Dr. Siddiqui was shot.  No bullets or bullet fragments consistent with an M4 rifle were found and no rifle shells were introduced into evidence.  None of Dr. Siddiqui's fingerprints were on the M4 rifle.

148.     Critical to the prosecution's case was the following.  The alleged eyewitnesses testified that Dr. Siddiqui aimed the rifle and fired it toward the far wall.  For example, Medic Dawn Card testified that she observed

Dr. Siddiqui aim and then fire the rifle in her direction.  The rifle bullets missed her and hit the wall to her left, causing some stucco to crumble (T. 968-69).

149.     FBI Agent Hurley testified that he conducted a visual inspection of the room on July 21, 2008 and examined that wall.  He testified that there were two holes in that wall "consistent with gunfire damage" (T. 631).  The holes were close to the ceiling, 7'5" and 7'7" from the floor, respectively *(Id.)*.  The holes, he testified, were "fresh" and their locations "matched" statements made by the eyewitnesses, including Dawn Card (T. 633).  There were no other holes in the walls consistent with bullet holes (T. 792).  When shown photographs of the holes, FBI tool mark examiner Carlo Rosatti opined that they "could be bullet impact holes" (T. 877).

150.     Defense counsel had in their possession evidence that would have conclusively refuted the prosecution's theory.  On March 18, 2009, the government produced to defense a CD.  On that CD was a video of a July 17, 2008 press conference concerning Dr. Siddiqui's arrest.  The press conference was held in the room where the shooting incident took place one day later.  Visible on that video are the two "bullet holes" that government witnesses testified were likely caused by the M4 rifle on July

18.  But clearly, as the holes were in that wall before the July 18 incident, they could not have been caused by the M4.  Counsel did not utilize the video during its cross examination of Agents Hurley and Rosatti.  Indeed, they apparently were only made aware of its exculpatory value when it was pointed out to them by the government shortly before the end of the trial (T. 1649-50 ).

## The Government's Summation

151.    The overriding theme of the prosecutor's summations was that in order to avoid returning a guilty verdict, the jury would have to find that the government witnesses lied under oath.  "To acquit," the prosecutor argued in his opening summation, "you have to find that [the government witnesses] lied to you" (T. 1947).

152.    In the defense summation, counsel Moreno disputed that improper characterization, telling the jury that the defense was not arguing that the government witnesses lied (T 2004.)  Instead, she argued that the physical evidence gave rise to a reasonable doubt whether an M-4 rifle was ever fired that day and/or whether Aafia Siddiqui fired that weapon (T. 2005-06).

153.    The defense summation did not dissuade the government from continuing its improper argument during its rebuttal summation. "[I]n

order to believe [the defendant's] case, you got to believe all those witnesses lied," he said (T. 2013). If even one of the government witnesses was telling the truth, he argued, "the whole defense falls apart" (T. 2014). "They [the defense] have to be saying that they lied" (*Id.*.). Because of this, the jury would "have to sit in judgment" of the government eyewitnesses (T. 2015).

154.     The defense "still hasn't presented to you any reason why they would lie," he argued. "What is their motive to lie?" (T. 2032).

155.     An acquittal, the prosecutor additionally argued, would also require a finding that defendant Dr. Siddiqui was telling the truth about all matters. If the jury did not believe her about whether she had completed a firearms course while attending MIT a decade earlier "then [the defense's] whole case goes out the window and gives you no reason to disbelieve the government's witnesses" (T. 2018).

156.     The case, the government argued, came down to whether the jury believed the defendant or the government: "[I]f you can't believe her story, you have no reason to disbelieve the government's witnesses" (T. 2039).

157.     On February 3, 2010, the jury returned its verdict convicting Dr. Siddiqui of the seven counts contained in the indictment.  In response to a special interrogatory requested by the government, the jury found that Dr. Siddiqui did not act with premeditation.

158.     On September 23, 2010, the court sentenced Dr. Siddiqui to an aggregate term of imprisonment of eighty-six years, five years of supervised release and a mandatory assessment of $700.

159.     In advance of sentencing neither party submitted any additional information concerning Dr. Siddiqui's whereabouts from March 2003 to July 2008.

**Admission By Pakistani Police Officer That He Arrested Aafia Siddiqui in 2003 And That She Was Turned Over To U.S. Agencies.**

160.     After the jury's verdict, evidence came to light that the prosecution knew or should have known that Dr. Siddiqui was, in fact, in United States' custody at some point between 2003 and 2008, but this information was not turned over to the defense for use at trial and/or at sentencing.

161.     The evidence consisted of two conversations, one of them secretly recorded, between Syed Bilal and Imran Shaukat.  In those conversations, Shaukat, the former Superintendent of Police in

Pakistan's Sindh Province (and current Deputy Inspector General in

Karachi) admitted that he had taken part in the arrest and detention of

Aafia Siddiqui and her children in March 2003.

162.    Syed Bilal is an American citizen and a resident of Garland, Texas.

He is employed as the Chairman and Chief Operating Officer of Gillani,

Inc.  On or about April 20, 2010, Bilal attended a dinner at the home of a

friend, Samir Iqbal.  Present at the dinner was Imran Shaukat.  Iqbal

introduced Shaukat as a friend from the days when both served in the

Pakistani Navy (See Affidavit of Syed Bilal sworn to May 6, 2014

attached to Motion to Vacate, ¶¶ 1-4, hereinafter "Bilal   ¶").

163.    Over the course of the evening, the conversation turned to

Shaukat's work, which included counter-terrorism efforts.  He described

several cases in which he was involved and eventually mentioned the

name Aafia Siddiqui.  Bilal knew of the case as it was a high-profile one

in Pakistan and among Pakistanis living in the United States.

164.    Shaukat told Bilal that he had personally been involved in Dr.

Siddiqui's 2003 arrest.  According to Shaukat, Siddiqui had been detained

by local police at the request of the FBI.  She was later turned over to

the ISI and American intelligence agencies for interrogation (Bilal ¶¶8-9).

165.     Bilal was invited to return to Iqbal's home the following evening. Shocked by what he had heard, he decided to secret a small digital audio recorder on his person.  During the course of the evening, Shaukat repeated some of the statements he had made the day before about Aafia Siddiqui's arrest (Bilal ¶¶ 11-12).

166.     The recording is about four hours long (Bilal ¶ 13).  It is attached to Bilal's affidavit as Exhibit 1.  What follows is a written excerpt of the most relevant conversation translated into English.[10]

> Bilal: (Referring to Dr. Siddiqui): Did you arrest her?
>
> Shaukat: Yes, I arrested her. She wore glasses and a veil … When she was caught she was travelling to Islamabad … She was hobnobbing with clerics …
>
> Bilal:  So what happened after the arrest? Did ISI ask for her custody?
>
> Shaukat: Yes, we gave her to ISI.
>
> Bilal: ISI or something else?
>
> Shaukat: ISI. So, we gave her to them.
>
> (Bilal Aff. Ex. 1, p. 28-29).

---

[10] The transcript attached to Bilal's affidavit labels the speakers as "Voice 1" (identified as Bilal), and "Voice 2" (identified as Shaukat). For purposes of clarity, "Voice 1" and "Voice 2" have been replaced here with the names of the speakers. In his affidavit Bilal swears that the transcript truly and accurately sets forth the conversation with Shaukat.

167.     Mr. Shaukat also describes her as "stick thin" and "a psycho",
and, elsewhere as "not a handler, a minor facilitator" — presumably for
Al-Qaeda — and he mentions a connection to Osama Bin Laden (*Id.* at
28, 30).  Asked then why she couldn't help them get Bin Laden, he
replies, "Well, they are not fools. They wouldn't inform her of their
forwarding address." (*Id.* at 30). And he says too about the children, "we
took them with us. They were American nationals. Children are
American nationals too. They were all born there." (*Id.* at 31).  There is
some discussion on the tape about the reappearance of Dr. Siddiqui's
daughter, Mariam:

> Bilal: Oh, another thing. They found her daughter
> yesterday.
>
> Shaukat: She's home already.
>
> Bilal: Yes, she's home. She speaks English only. She
> was in the prison. She is seven or eight years old. And
> she only speaks English.
>
> UM1: Eight years old?
>
> Bilal: Yeah. Children were in prison and they spoke to
> them in American English.
>
> UM1: Is she home?
>
> Bilal: Yeah. They got her home.
>
> Shaukat: They were actually, I.
>
> Bilal: Really?

Shaukat: It's five or six months.

UM2: Is she in Karachi?

Bilal: She got home today, yesterday.

Shaukat: Well, it goes back to before I came here.

Bilal: I read the news just yesterday, today. Maybe, in the night.

Shaukat: It's two or three months old.

(*Id.* at 30-31).

168.    While the reappearance of Dr. Siddiqui's daughter had only been publicly disclosed a couple weeks before the recording, Shaukat stated that he knew that the daughter had already been in Pakistan for several months.  In fact, Dr. Siddiqui's daughter Mariam had been recovered from an orphanage in Afghanistan several months prior to her reappearance.  She was secretly held in custody in Pakistan for several weeks prior to being dropped off in front of her grandmother's house in Karachi.  The fact that she had actually been repatriated to Pakistan several months prior to her being reunited with her relatives was never reported in the media.  Accordingly Shaukat could not have learned this from public sources.

169.    In or about February 2011, the Siddiqui family attorney, Tina Foster Esq. emailed a copy of the Shaukat transcript to Dawn Cardi, Esq. and her

associate Chad Edgar, Esq. who were, at the time, representing Dr. Siddiqui on direct appeal.   Ms. Foster spoke with Edgar over the telephone and advised him that Shaukat was currently located in New York City and urged him to make legal use of the information.   Mr. Edgar told Ms. Foster that counsel lacked the resources to pursue the matter.  No motion based upon the Shaukat disclosures was filed pursuant to Fed.R.Crim.P. 33.

## CLAIMS

I.     Aafia Siddiqui was denied her right to counsel as guaranteed by
       the Sixth Amendment when the court permitted her to be
       represented by counsel retained by a third party where she did not
       assent to that representation.  *Faretta v. California*, 422 U.S. 806,
       821 (1974);

II.    Aafia Siddiqui was denied her right to counsel as guaranteed by
       the Sixth Amendment when she was denied a meaningful
       opportunity to obtain and retain counsel of her own choice.
       *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006);

III.   Aafia Siddiqui was denied her right to counsel as guaranteed by
       the Sixth Amendment due a complete breakdown in the attorney-
       client relationship between Dr. Siddiqui and all counsel.  *McKee v.
       Harris*, 649 F.2d 927 (2d Cir. 1981);

IV.    Aafia Siddiqui was denied her right to counsel as guaranteed by
       the Sixth Amendment where counsel operated under a potential
       and/or actual conflict of interest due to the fact that they were
       being paid by a third party.  *Strickland v. Washington*, 466 U.S. 668,
       692 (1984);

V.    Aafia Siddiqui was denied her right to effective assistance of trial

counsel as guaranteed by the Sixth Amendment when her

attorneys,

    a.  Failed to investigate the circumstances surrounding her

        disappearance in 2003;

    b.  Failed to utilize, during cross examination of the

        government's witnesses, the video showing that the

        holes in the walls were present before the July 18, 2008

        shooting incident;

    c.  Failed to object to the prosecutor's improper remarks

        during opening and rebuttal summation and/or move

        for a mistrial;

    d.  Failed to move for a new trial pursuant to Fed. R. Crim.

        P. 33 when they learned of a recording wherein a

        Pakistani law enforcement official admitted

        participation in Aafia Siddiqui's 2003 abduction and

        subsequent detention.

VI.   Aafia Siddiqui was denied her right to effective assistance of

appellate counsel as guaranteed by the Sixth Amendment when

her attorney failed to argue that plain error was committed during

the prosecutor's summations.

VII.   Aafia Siddiqui was denied due process of law when the

prosecution failed to produce evidence in its possession that

would have proven that she was abducted in 2003 and thereafter

turned over to United States' custody;

WHEREFORE, it is respectfully requested that this Court issue an order

vacating Aafia Siddiqui's conviction and ordering such other and further relief

as this Court deems just and proper.

Dated: New York, New York
    May 12, 2014               Yours, etc

ROBERT J. BOYLE
351 Broadway
3rd floor
New York, N.Y. 10013
(212) 431-0229
Attorney for Aafia Siddiqui

Of Counsel:

TINA FOSTER, ESQ.
5500 W. Ridge Rd.
Spencerport, N.Y.  14559
(917) 442-9580
tmf@tinafoster.com