**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------**X**

**AAFIA SIDDIQUI,**

<div align="center">Movant,</div>

<div align="center">-against-</div>                                            10 CV 3437
                                                                                                (RMB)

**UNITED STATES OF AMERICA,**

<div align="center">Respondent.</div>

-----------------------------------------------------------------**X**

<div align="center">

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO VACATE PURSUANT TO 28 U.S.C. § 2255

### PRELIMINARY STATEMENT

</div>

This memorandum is respectfully submitted in support of Aafia Siddiqui's

Motion to Vacate pursuant to 28 U.S.C. § 2255.

<div align="center">

### STATEMENT OF FACTS

</div>

The facts relevant to this motion are set forth in the accompanying Motion and

the Exhibits attached thereto.

<u>POINT I</u>

**AAFIA SIDDIQUI WAS DENIED HER
RIGHT TO COUNSEL AS GUARANTEED
BY THE SIXTH AMENDMENT**

**I. The Standard under 28 U.S.C. §2255.**

28 U.S.C. §2255 permits a person held in federal custody to petition the
sentencing court to vacate, set aside, or correct a sentence.  A defendant is entitled to
relief under 28 U.S.C. §2255 if she establishes, *inter alia*, that the sentence was imposed
in violation of the Constitution or laws of the United States.  *Hill v. United States*, 368
U.S. 424, 428 (1962).

**II. The Right To Counsel**

The Sixth Amendment to the United States Constitution provides that "[i]n all
criminal prosecutions, the accused shall enjoy the right...to have the Assistance of
Counsel for his defense."  The assistance of counsel is "the means through which the
other rights of the person on trial are served."  *United States v. Cronic*, 466 U.S. 648, 653
(1984).  It attaches at all critical stages of a criminal prosecution.  *Id.* at 659, n.25.  An
accused with sufficient financial means also has the right to secure counsel of his or
her own choice.  *United States v. Cronic*, 466 U.S. 648, 656 (1984) *Powell v. Alabama,* 287
U.S. 45, 53 (1932); *United States v. Stein*, 541 F.3d 130, 155-156 (2d Cir. 2008).

The right to effective assistance of counsel encompasses the right to conflict-
free counsel.  *Wood v. Georgia*, 450 U.S. 261, 271-72 (1981); *Cuyler v. Sullivan*, 446 U.S.

335, 356 (1980); *Ventry v. United States*, 539 F.3d 102, 110 (2d Cir. 2008).

Representation by an attorney laboring under an actual conflict of interest is

tantamount to no representation at all. *Strickland v. Washington,* 466 U.S.668, 686

(1984).

Aafia Siddiqui was denied her Sixth Amendment right to counsel in the

following three ways.  First, she was denied the right to conduct her own defense

when the trial court forced her to accept counsel retained by a third party.  Second,

she was denied her right to conflict-free counsel when the lower court failed to

inquire whether Dr. Siddiqui was willing to waive any conflict arising out of the fact

that her attorneys were paid by the Government of Pakistan.  Third, the trial court

abused its discretion when it denied Dr. Siddiqui's timely motion for a continuance

and substitution of counsel due to a complete breakdown in the attorney-client

relationship.[1]


## III.  Aafia Siddiqui Was Denied Her Sixth Amendment Right To Conduct Her Own Defense When The Court Forced Her To Accept Counsel Retained By A Third Party

In or about August 2009, attorneys Linda Moreno, Charles Swift and Elaine

Sharp entered into a contract with the Government of Pakistan to represent the

---

[1] Separately addressed in Point II *infra* is Dr. Siddiqui's related claim that she was denied effective assistance of trial and appellate counsel.

defendant, Aafia Siddiqui.  Aafia Siddiqui was not a party to that contract and she did not consent to their representation.  On numerous occasions after the three attorneys filed Notices of Appearance, Dr. Siddiqui made it abundantly clear that she had not hired them, they were not her lawyers and that they had no authority to act on her behalf.  The trial court's imposition of those attorneys on Dr. Siddiqui violated her rights under the Sixth Amendment.  As the error committed was a structural one this Court should vacate the judgment of conviction without conducting a harmless error analysis.

The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.  The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Faretta v. California*, 422 U.S. 806, 818 (1974).  It is because the right is personal that an accused may choose to conduct her own defense without counsel, so long as her waiver of it is knowing and intelligent.  *Id.*

That same constitutional principle – the right to personally control one's own defense – also means that a financially able defendant has the right to counsel of choice.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006).  That right necessarily encompasses the right to <u>choose</u> to <u>reject</u> the services of an attorney who is neither retained by the accused nor appointed by the court pursuant to the Criminal Justice Act.  That is because

4

> an unwanted counsel, 'represents' the defendant only
> through a tenuous and unacceptable legal fiction.  Unless
> the accused has acquiesced in such representation, the
> defense presented is not the defense guaranteed him by the
> Constitution, for, in a very real sense, it is not his defense.

*Faretta v. California*, 422 U.S. at 821.  Accordingly, "representation" by an attorney

retained by a third party over the accused's objection is a "legal fiction" and a *per se*

violation of the Sixth Amendment.  *Cottenham v. Jamrog*, 248 F.App'x 625, 635-36 (6th

Cir. 2007) (Sixth Amendment violated where, over defendant's objection,  counsel

retained by defendant's parents represented him on direct appeal); *United States v.*

*Woodard*, 291 F.3d 95, 107 (1st Cir. 2002) ([u]nlike a defendant with appointed

counsel, the defendant was not dependent on the court's permission to replace [her

attorney]"); *Wilson v. Mintzes*, 761 F.2d 275, 279-80 and n. 6 (6th Cir. 1985)

("Dictating who shall act as counsel for the accused, like dictating that an accused

shall be represented by counsel, essentially imposes an organ of the state between an

unwilling accused and his right to choose his defense and violates the logic of the

sixth amendment.").

Cottenham, supra, was a petition for a writ of *habeas corpus* pursuant to 28 U.S.C.

§2254.  The petitioner was convicted of assault with intent to murder.  The court

appointed attorney Bell to represent him on appeal.  Unbeknownst to the petitioner,

his parents retained attorney Gust to prosecute the appeal.  Upon learning of Gust's

involvement, the petitioner sent a letter to the court stating that he had not consented

to that substitution.  Bell responded that he was unable to continue as Gust had filed a Notice of Appearance.  Gust filed a brief on the merits.  Before the case was argued, the trial court, responding to the petitioner's earlier motions, relieved Gust and appointed new counsel, Szabo.  Szabo filed motions in the appellate court to adjourn oral argument that was denied.  The appellate court affirmed the conviction on the papers filed by Gust.

Reversing the denial of §2254 relief, the United States Court of Appeals for the Sixth Circuit, relying on *Faretta*,  held that the petitioner had been unconstitutionally denied his Sixth Amendment right to counsel on appeal.  It granted the writ contingent upon the state court providing the petitioner with a *de novo* appeal. *Cottenham*, 248 F.App'x at 635-36.

Application of the same principles compels the conclusion that Aafia Siddiqui was denied her right to counsel.  On August 11, 2009, attorneys Moreno, Swift and Sharp notified the Court that they had been retained by the Government of Pakistan to represent Dr. Siddiqui.  On September 2, 2009, her first appearance in court after their entry into the case, Dr. Siddiqui clearly and unequivocally rejected their representation:

> THE DEFENDANT: Excuse me sir, I don't agree with that.  I don't agree with the team you are putting together for me and the consulate had no right to do that.  I never gave anybody that right and I already

> requested [Attorney Dawn] Cardi to please leave this
> case last time, clearly.

(T. 9-2-09, p. 7).[2]  When told by the Court that the attorneys had been hired by the

Government of Pakistan for her and that she had no other counsel, Dr. Siddiqui

replied

> I'm not – where I am I can't find my own counsel you
> put me in such conditions.  I'm sorry I just don't
> agree with anyone that's provided.  You can't just
> impose people and say do that…

> They are not my attorneys.

(*Id.* at 8, 9).   On the same date Dr. Siddiqui sent a letter to the court memorializing

her rejection of the three newly "retained" lawyers, as well as CJA counsel Dawn

Cardi (Government letter dated September 11, 2009).[3]

Another conference was convened on November 3, 2009.  During an extended

colloquy, a portion of which was sealed, Dr. Siddiqui expressed her distrust of and

disagreements with all counsel.  ████████████████████████

---

[2] Dr. Siddiqui's rejection of attorney Dawn Cardi who was appointed pursuant to the
Criminal Justice Act and not paid by a private party is governed under a different
standard and is addressed in subdivision 2 *infra*.  Assuming, *arguendo*, that Dr.
Siddiqui's motion to relieve Ms. Cardi was properly denied, for the reasons set forth
later in this subdivision her presence at the defense table did not cure the Sixth
Amendment violation occasioned by the continued participation of attorneys Moreno,
Swift and Sharp.

[3] Dr. Siddiqui's letter read as follows: " I would like to relieve Ms. Dawn Cardi and all
my other "counsel" from representing me:  (September 11, 2009 Government letter,
filed under seal).



████████████████ The court denied Dr. Siddiqui's motion to dismiss counsel in an oral decision on November 3 that was followed by a November 10, 2009 written order.  It held that *Faretta* was inapplicable because Dr. Siddiqui had not expressed a desire to represent herself.  With respect to Dr. Siddiqui's dissatisfaction with counsel and problems with communication with them, the court concluded that those issues did not justify substitution of counsel "at this time" (Order, November 10, 2009, Docket #122).

Missing from the court's analysis is any discussion about whether attorneys Moreno, Swift and Sharp should have been permitted to enter the case in the first place.  That <u>is</u> governed by *Faretta*.  The right to self-representation recognized in *Faretta* arises from the fact that the rights guaranteed by the Sixth Amendment are <u>personal</u> to the accused.  "An attorney's actions," ruled the Court, "can only be justified…by the defendant's consent, <u>at the outset</u>, to accept counsel as his representative.  An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction." *Faretta v. California*, 422 U.S. at 820 (emphasis

added).   It was Dr. Siddiqui who had the right to decide whether attorneys Moreno, Swift and Sharp should have been permitted to enter the case at all.  They were retained by a third party – the Government of Pakistan, not Dr. Siddiqui.  They entered a Notice of Appearance without Dr. Siddiqui's consent.  At her earliest opportunity, the September 2, 2009 conference, Dr. Siddiqui rejected them and told the court that they could not act as her attorneys.  She maintained that position throughout the remainder of the proceedings.  Attorneys Moreno, Swift and Sharp's representation of Dr. Siddiqui was, under *Faretta*, a "legal fiction."  They simply had no legal authority to take any action on her behalf.

Dr. Siddiqui's rejection of attorneys Moreno, Swift and Sharp "at the outset" sets this case apart from those involving a defendant's request for substitution of counsel.  *See, e.g. United States v. Brumer*, 528 F.3d 157 (2d Cir. 2008).  In such cases, the attorney the defendant sought to discharge had been either appointed by the Court or retained by the defendant him or herself.  Here, Dr. Siddiqui did not retain the attorneys herself or consent to their representation of her.  When Dr. Siddiqui first learned that the Government of Pakistan was on the verge of retaining attorneys to represent her, she voiced her concerns.  ███████████████████████████ ████████████████████████████████████████  She added that she was

_____

[4] During discovery the Government produced transcripts of recorded telephone conversations while Dr. Siddiqui was at FMC Carswell and MDC Brooklyn.  With the exception of the September 4, 2009 conversation, all of the transcripts referenced in this motion have been made part of Exhibit A.  The transcripts contain consecutive

████████████████████████████████████████ At the same time,
Dr. Siddiqui's brother, Muhammad Siddiqui, made it clear to all concerned that the
lawyers would have to be acceptable to Dr. Siddiqui and have her trust (Exhibit C, p.
2).  Thus, Dr. Siddiqui was not seeking "substitution" of counsel.  She objected to the
fact that they were permitted to enter the case at all.

It is of no moment that the three attorneys sought to enter the case utilizing the
Vienna Convention.  By its very terms, that Convention prohibits a counselor office
from taking any action on behalf of its national where, as here, the national expressly
opposes such action:

> counselor officers shall have the right to visit a national of
> the sending state who is in prison, custody or detention, to
> converse and correspond with him and to arrange for his
> legal representation….Nevertheless, consular officers shall
> refrain from taking any action on behalf of a national who
> is in prison, custody or detention if he expressly opposes
> such action.

Vienna Convention on Consular Relations, art. 36(1)(c), Apr. 24, 1963, 596 U.N.T.S.
261 (emphasis added).  As soon as she was able to express it, Dr. Siddiqui
unequivocally "opposed" the action undertaken by the Government of Pakistan,
namely retaining lawyers to represent her.  At that point it was their duty under the
Convention to "refrain" from that action.  Instead, and contrary to the clear terms of
the Convention, the Government of Pakistan, with the approval of the court, wrestled

---

Bates numbers in the lower right corner.  The page number in the Exhibit reference
refers to the Bates number and not the page number of the individual conversation.

control of the defense from Dr. Siddiqui, thereby violating her Sixth Amendment

rights.[5]

To be sure, had Dr. Siddiqui's choice been honored and the Notices of

Appearance voided, she would have been deprived of the talents of three experienced

attorneys.  The remaining attorney, Dawn Cardi, or perhaps another appointed

attorney would have been left to conduct the trial.[6]  Or Dr. Siddiqui would have been

instructed that she must either accept appointed counsel or represent herself.  *McKee v.

Harris*, 649 F.2d 927, 931 (2d Cir. 1981).   Just like the decision to waive counsel

entirely, that may not have been the wisest course.  But it is what the Sixth

Amendment commands:   "It is one thing to say that every defendant, rich or poor,

has the right to the assistance of counsel, and quite another to say that a State may

compel a defendant to accept a lawyer [she] does not want."  *Faretta v. California*, 422

U.S. at 833.  *See also Clark v. Perez*, 510 F.3d 382, 394 (2d Cir. 2008) ("The defendant's

---

[5] Indeed, there are important reasons why a foreign national should be given the right
to reject the legal assistance offered by the government of his or her home country.  A
foreign national who is a dissident, for example, or subject to various forms of
persecution at home may justifiably fear that her home government would not be
acting in her interests.   In Dr. Siddiqui's case, the Government of Pakistan was
responsible for the illegal arrest of Dr. Siddiqui and her three children in March 2003.
Her distrust of their motives in hiring attorneys was, therefore, well-placed.
[6] Ms. Cardi actively opposed Dr. Siddiqui's efforts to prevent attorneys Moreno, Swift
and Sharp from entering the case.  As discussed *infra*, this undoubtedly contributed to
the total breakdown in communication between Dr. Siddiqui and all counsel and
warranted their substitution.

right to counsel does not generally empower courts to force counsel upon a criminal defendant.").

During the various colloquies and submissions, counsel cited *Indiana v. Edwards*, 554 U.S. 164 (2008) for the proposition that the Court could overrule Dr. Siddiqui's decision to reject the counsel retained by the Government of Pakistan.  In *Edwards*, the United States Supreme Court held that the Sixth Amendment permits States to "insist upon representation by counsel for those competent to stand trial under [*United States v.*] *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."  *Indiana v. Edwards*, 544 U.S. at 178.  *Edwards*, however, is inapplicable.  Of paramount importance to the Court in *Edwards* was the fact that self-representation at a trial would not "affirm the dignity" of a defendant who suffers from a severe mental illness.  *Id.* at 176.  Furthermore, the Court stressed that trials must not only be fair but must "appear to be fair to all who observe them."  *Id.* at 177.  Permitting a mentally ill defendant to conduct the proceedings would run counter to that goal.

None of those concerns apply here.  Aafia Siddiqui did not assert her right to represent herself.  She simply chose to exercise her right, guaranteed by the Sixth Amendment and *Faretta*, to refuse the services of attorneys who were neither retained by her nor appointed by the Court.  There is no authority for the proposition that an *Edwards*-style competency hearing is required, or even advisable, when a defendant refuses the services of attorneys hired by a third party.

The Sixth Amendment violation was not cured by the fact that Dawn Cardi participated in the defense along with attorneys Moreno, Swift and Sharp.  Attorney Linda Moreno acted as lead counsel.  She gave the opening and closing statements. She decided who would be responsible for cross examining particular government witnesses.

A Sixth Amendment violation is structural error and not subject to harmless error analysis.  *United States v. Gonzalez-Lopez*, 548 U.S. at 150; *United States v. Stein*, 541 F.3d at 157.  The same reasoning that led the Supreme Court to conclude that the erroneous deprivation of the right to counsel of choice qualifies a "structural error" applies with equal force here as the effect of the participation of attorneys Moreno, Swift and Sharp.  It is not something that is quantifiable:

> Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of witnesses, and style of witness examination and jury argument.  And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial…Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all.  Harmless error analysis is such a context would be a speculative inquiry into what might have occurred in an alternate universe.

*United States v. Gonzalez-Lopez*, 548 U.S. at 150.  In the instant case, there is an additional unquantifiable factor: the willingness of the defendant to cooperate with the unwanted counsel.  Aafia Siddiqui rejected them from the outset.  In so doing, she

questioned whether the lawyers would be serving her interests or those of the Government of Pakistan, the entity that was paying the bills.[7]  Whether that concern was, in fact, valid, is beside the point.  That Dr. Siddiqui <u>believed</u> that those lawyers might be serving interests other than her own would necessarily impact on her willingness to cooperate with them.  *Faretta*, 422 U.S. at 834 ("[t]o force a lawyer on a defendant can only lead him to believe that the law contrives against him.").  Accordingly, there was a *per se* violation of the Sixth Amendment.

## IV.  Dr. Siddiqui Was Denied Her Right to Conflict-Free Counsel.

The record establishes that attorneys Moreno, Swift and Sharp had an actual conflict of interest arising out of their retention by the Government of Pakistan.  That

---

[7] That Dr. Siddiqui feared that the attorneys would not represent her interests is illustrated by the following colloquy:

> THE COURT: OK, but I just want you to understand, at least four of whom have been retained by the government of Pakistan.
>
> THE DEFENDANT: Yes, but you insist to keeping them.  I have the right to relieve them.
>
> THE COURT: -- at great expense.
>
> THE DEFENDANT: But I have relieved them many times.  I do not want them.  <u>They are respectfully working for other respectful people, not me.</u>

(T. 347-48) (Emphasis added).

conflict adversely affected the defense in that they prevented Aafia Siddiqui from securing leniency through a meeting with the government, an action that was in conflict with the interests of Pakistan.  That conflict denied Dr. Siddiqui her rights under the Sixth Amendment and warrants that the conviction be vacated.  *See Cuyler, v. Sullivan*, 446 U.S. at 349-50.

"When the trial court knows or reasonably should know of the possibility of a conflict, it has a threshold obligation to determine whether the attorney has an actual conflict, a potential conflict or no conflict." *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir. 1998) (citing *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994)).  If through its inquiry the court determines that the attorney suffers from an actual or potential conflict, the court has a "disqualification/waiver" obligation.  If the conflict is severe, the attorney must be disqualified.  If it is a lesser or potential conflict, such that a rational defendant could still want the attorney's services, a court must follow the procedures outlined by the Second Circuit in *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982) and insure itself that the defendant knowingly and intelligently waives any conflict of interest.  Where, as here, the court concludes that there is no conflict and no need to conduct a *Curcio* hearing, reversal is required if the defendant can establish that the attorney had either 1) "a potential conflict of interest that resulted in prejudice to the defendant or 2) an actual conflict of interest that adversely affected

the attorney's performance." *United States v. Leslie*, 103 F.3d 1093, 1098 (2d Cir. 1997).

It is well-recognized that there are "inherent dangers that arise when a defendant is represented by an attorney hired and paid by a third party." *Wood v. Georgia*, 450 U.S. 261, 268-69 (1981); *Amiel v. United States*, 209 F.3d 195, 199 (2d Cir. 2000).  Attorneys Moreno, Swift and Sharp were retained by the Government of Pakistan.  They were paid $500,000 apiece with an additional $500,000 allocated for litigation expenses and investigation.   Dr. Siddiqui rejected their representation, informing the court on September 2, 2009 that the attorneys were hired without her authority.  Yet notwithstanding that the attorneys were paid by a third party and entered the case over Dr. Siddiqui's objection, the court declined to conduct a *Curcio* hearing, concluding that counsels' affirmation that they would represent Dr. Siddiqui's interests and no others obviated the need for any inquiry.  This was error.

Payment of fees by the Government of Pakistan arguably create a conflict of interest notwithstanding counsel's affirmations to the contrary.  *Wood v. Georgia*, 450 U.S. at 268-69; *Amiel v. United States*, 209 F.3d at 199; *See also Bryan v. Gibson*, 276 F.3d 1163, 1173 (10th Cir. 2001); *Quintero v. United States*, 33 F.3d 1133, 1135 (9th Cir. 1994).  Thus, the court should have moved to its "disqualification/waiver" obligation and conducted a *Curcio* hearing.  In this case, the need for a *Curcio* inquiry was plain.  Upon being informed that the third party lawyers entered the case, Dr. Siddiqui

16

affirmatively and repeatedly told the court that she rejected them and did not trust them.  And she told the Court that her distrust was based, in part, on her belief that the attorneys would be representing the interests of Pakistan and not her own. (T. 347-48).

During the course of the proceedings, it became evidence that the conflict was "actual" and not "potential."  An actual, as opposed to potential conflict exists "when, during the course of the representation, the attorney's and the petitioner's interests 'diverge with respect to a material factual or legal issue or course of action.'"  *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993) (quoting *Cuyler v. Sullivan*, 446 U.S. at 356, n.3.).

Dr. Siddiqui told the court that one of her disagreements with counsel stemmed from the fact that they refused to facilitate a meeting with the government. Dr. Siddiqui thought that such a meeting might lead to resolution of the charges against her. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

8 ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[redacted]

Counsel were being paid by the Government of Pakistan. [redacted]

[redacted] Counsel, who were dependent upon the Government of

---

[redacted]

Pakistan not only for payment of fees but also defense costs, were obviously not in a position to alienate that government. Therefore, counsel's interests and Dr. Siddiqui's "diverge[d] with respect to a material factual or legal issue or to a course of action," thereby creating an actual conflict. *Cuyler v. Sullivan*, 446 U.S. at 356, n.3.

In addition, Dr. Siddiqui has stated that she believes that the Government of Pakistan was responsible for her 2003 arrest and detention. She recognized her captors as both Pakistanis and Americans. Other than requesting that the United States government release its "classified" file on this five years, it appears that there was no investigation of that time period (*See* Exhibit G). The Government of Pakistan was not only paying the attorneys, they paid for any investigation. It would not have been in the Pakistani government's interest if its involvement in the 2003 arrest and detention of Dr. Siddiqui was verified. Indeed, it was in its interest to keep any such involvement secret.

Once an actual conflict is established, prejudice is presumed. *Strickland v. Washington*. 466 U.S. at 692. To warrant relief, a defendant need only show that the conflict "affected" the conduct of the defense, *Mickens v. Taylor*, 535 U.S. 162, 171-72 (2002), or that there was a "lapse" in representation. *Cuyler v. Sullivan*, 446 U.S. at 349.

To prove an adverse affect,

> [a defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would

necessarily have been successful if it had been used, but
that it possessed sufficient substance to be a viable
alternative. Second, he must establish that the alternative
defense was inherently in conflict with or not undertaken
due to the attorney's other loyalties or interests.

*Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993).  Both parts of the test are satisfied

here.  First, it may be true that a meeting with the government would not have

resulted in reduced charges or a §5K1.1 letter.  But it certainly was a *plausible* strategy.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████  Likewise, independently investigating the circumstances

surrounding Dr. Siddiqui's 2003 disappearance and subsequent detention may have

turned up nothing or it may have uncovered evidence to corroborate her claims.[9]

With respect to the second prong, a meeting between Aafia Siddiqui and the

United States government and further investigation into her 2003 disappearance were

"inherently in conflict" with the interests of the Pakistani government, the entity that

was footing the bills.  ███████████████████████████████████████████

█████████████████████████████████████████████  In addition, Dr.

_____

[9]Attached as Exhibit 1 to the affidavit of Bilal Syed is the transcript of a recording
with Imran Shaukat, a former senior Pakistani police official and current Deputy
Inspector General in Karachi.  He has admitted participating in Dr. Siddiqui's 2003
abduction.  The Government of Pakistan neither offered to make Shaukat available to
defense counsel as a witness not provided any other evidence to corroborate Dr.
Siddiqui's account of the five years she spent in custody.  For its part, defense counsel
did not seek to obtain any such information from the Government of Pakistan or
independent sources

Siddiqui implicated the government of Pakistan in her 2003 abduction. Further investigation could have uncovered corroboration. It was in the Pakistani government's interest, however, to keep those matters secret.

## V.  As The Record Establishes A Complete Breakdown In The Attorney-Client Relationship, The Court Abused Its Discretion When It Denied Aafia Siddiqui's Timely Applications For A Continuance And New Counsel.

As argued in subdivision III *supra*, Aafia Siddiqui was denied her Sixth Amendment right to counsel when attorneys hired by a third party were permitted to enter the case and represent her over her timely objection. The right was additionally and independently violated when the court rejected her attempts to fire her attorneys (both retained and CJA) and give her time to retain counsel of choice.

"It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of [her] own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932); *see also Wheat v. United States*, 486 U.S. 153, 159 (1988). Thus, courts must recognize a presumption in favor of defendant's counsel of choice. *Wheat v. United States*, 486 U.S. at 164. The importance of this aspect of the Sixth Amendment's guarantees cannot be understated.  "The right to retain private counsel serves to foster the trust between attorney and client that is necessary for the attorney to be a truly effective advocate." *See* Standards for Criminal Justice 4-3.1, p. 4-29 (commentary) (2d ed. 1980). A defendant's "perception of the fairness of the process, and his willingness to acquiesce in its results depend

upon his counsel's dedication, loyalty and ability." *Caplin & Drysdale Chartered v. United States*, 491 U.S. 617, 645 (1989) (Blackmun, J. dissenting) (citing *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J. concurring)).

The right to counsel of one's own choosing is not, of course, absolute.  A defendant does not have the unfettered right to retain new counsel.  *United States v. Brumer*, 528 F.3d 157, 160 (2d Cir. 2008) (citing *United States v. Paone*, 782 F.2d 386, 392 (2d Cir. 1986)).  Ultimately, the Sixth Amendment bars a court from denying a defendant the right to retain her choice of counsel arbitrarily or unreasonably.  *Lafinesta v. Artuz*, 253 F.3d 151, 156 (2d Cir. 2001).  Related motions for substitution of retained counsel and a continuance implicate both the Sixth Amendment right to counsel of choice and the Fifth Amendment right to due process of law.  *Morris v. Slappy*, 461 U.S. 1, 11 (1983).  A denial of a motion for a continuance itself violates a defendant's right to due process if it is arbitrary or unreasonable.  *Ungar v. Sarafite*, 376 U.S. 575 (1964).  This is so because "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel and empty formality."  *Id.* at 588.  *See also United States v. Brumer* 528 F.3d at 161 (citing *Daniels v. Woodford*, 428 F.3d 1181, 1200 (9th Cir. 2005)).

The United States Court of Appeals for the Second Circuit has stated that when faced with a request by a defendant to retain new counsel, a trial court must "consider…the risks and problems associated with the delay, and whether

substitutions would disrupt the proceedings and the administration of justice." *United States v. Paone*, 782 F.2d at 392 (citing *McKee v. Harris*, 649 F.2d at 931).  Where a defendant requests the appointment of new counsel pursuant to the Criminal Justice Act, a slightly different tests applies.  In such an instance, a trial court should apply the four-part test adopted in *United States v. John Doe No. 1*, 272 F.3d 116, 122-23 (2d Cir. 2001).  A court considers 1) whether the defendant made a timely motion requesting new counsel; 2) whether the trial court adequately inquired into the matter; 3) whether the conflict between the defendant and her attorney was so great that it resulted in a "total lack of communication preventing an adequate defense; and 4) whether the defendant substantially and unjustifiably contributed to the breakdown in communication.  *Id.*  In this case, Dr. Siddiqui sought an opportunity to seek and retain new counsel.  She did not seek appointment of new CJA counsel.  Accordingly, the *Brumer/Paone* test should apply.  However, each of the *John Doe No. 1* factors will be addressed as the Second Circuit has stated that they may be considered when determining whether substitution "would cause substantial delay and inefficiency." *United States v. Brumer*, 528 F.3d at 161.  In any event, whether the *John Doe No. 1* factors are formally considered or simply used to inform the *Brumer* standard, it is clear that Dr. Siddiqui was not accorded a reasonable opportunity to retain counsel of choice and her Sixth Amendment rights were violated.

### a.  Timeliness of the Request

From the beginning of the proceedings, Dr. Siddiqui evidenced an intent to retain counsel of choice. ████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

Several months later, Dr. Siddiqui was made aware of the efforts by the Government of Pakistan to retain counsel for her.  But she made clear that she was the one to make the following decision. ██████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████ Notwithstanding that conversation, on August 11, 2009, attorneys Linda Moreno, Charles Swift and Elaine Sharp sent a letter to the court accompanied by their Notices of Appearance (Document # 76).  On September 2, 2009, more than four months before the scheduled trial date, the court granted counsel's pro hac vice applications without conducting any inquiry of Dr. Siddiqui (T. 9-2-09, p. 13).

During the September 2 conference, Dr. Siddiqui informed the court that she rejected the new attorneys' representation and discharged CLA attorney Dawn Cardi. She told the court that but for her restricted conditions, she would have made further efforts to find her own lawyer. She asked for time to do so (*Id.* at 20-22, 31). Her request was not addressed and counsel remained in the case.

Special arrangements were made for Dr. Siddiqui to speak with her brother over the telephone. She did so on September 4, 2009.[10] ███████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████

On October 4, 2009, Dr. Siddiqui sent another letter to the court discharging all counsel but specifically naming attorneys Dawn Cardi and Charles Swift (Docket # 117). ███████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████

---

[10] At the Brooklyn MDC, Dr. Siddiqui was permitted only one non-legal telephone call per month.

███████████████████████████████████████████

████████████████████████

The foregoing establishes beyond cavil that Dr. Siddiqui's requests were timely. This was not a request made on the eve of trial. Dr. Siddiqui sought to discharge retained and CJA counsel on September 2, 2009, over <u>four months</u> before the January 19, 2009 scheduled trial date. Her request came during her very first appearance in court after retained counsel's August 11, 2009 notification to the Court that they had been retained by the Government of Pakistan. While attorney Dawn Cardi had been in the case since February 2009, her work primarily concerned the competency issues. These issues were not resolved until July 2009. Preparation of Dr. Siddiqui's legal and factual defense to the indictment had not yet begun.[11]

That Dr. Siddiqui did not have an ironclad alternate plan for counsel on November 3, 2009 was not a reason to deny her a reasonable opportunity to do so. She was incarcerated under conditions wherein she could only make one telephone call per month. Her only family in this country resides in Texas. At a minimum, the court should have given her a date certain wherein she would come back to court with alternate counsel or a definite plan for obtaining one. If she failed to do so, the court

---

[11] ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

could then have instructed her that she could proceed with current counsel, request new court appointed counsel, or proceed *pro se*. *McKee v. Harris*, 649 F.2d 927, 931-33 (2d Cir. 1981). Rather, Dr. Siddiqui left the November 3, 2009 court appearance believing that because she had not come prepared with a "Plan B" on that date, she was stuck with attorneys that she did not want (T. 11-3-09, p. 89-90).

### b. Whether The Court Adequately Inquired Into The Matter.

The court did conduct an extensive colloquy with Dr. Siddiqui during the September 2, 2009 and November 3, 2009 conferences. However, it is submitted that the colloquies were deficient in certain respects. First, the court never asked Dr. Siddiqui how much time she might need to find alternate counsel. Nor did the court propose a certain amount of time and instruct Dr. Siddiqui that she would have to find alternate counsel by that date. Rather, it instructed her that her "failure" to have a "Plan B" on November 3, 2009 was essentially fatal to her request.[12]

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[12] The Court did tell Dr. Siddiqui that it would entertain any further "application" but certainly made it clear that its trial schedule was not to be altered.



**c. Whether There Has Been A Complete Breakdown In The Attorney Client Relationship And**

**d. Whether The Defendant Unjustifiably Contributed To The Breakdown.**

In this case, there was not a "breakdown" in the attorney-client relationship. There was never one to begin with.  Aafia Siddiqui did not recognize Dawn Cardi, Linda Moreno, Charles Swift and Elaine Sharp as her attorneys.  There was little, if any, substantive communication between Dr. Siddiqui and the attorneys from the time they came into the case the case up to and including sentencing.   Attorney Linda

---

[13] Of course, Dr. Siddiqui also told the court that counsels' refusal to facilitate a meeting with the government was only one of the reasons why she rejected them.

Moreno told the court that Dr. Siddiqui did not talk with her and that when Ms.

Moreno tried to speak with her that day, she refused to do so (T. 1156).  Elaine Sharp

added that Dr. Siddiqui had ████████████████████████████████████████

████████████████████████████████████ Dr. Siddiqui herself

acknowledged, "I don't look at them, I don't want them" (T. 342).

     The cause of the "breakdown" must be viewed as stemming from this critical

fact: three of the attorneys, Linda Moreno, Charles Swift and Elaine Sharp, were

retained by a third party <u>imposed</u> on Dr. Siddiqui.  As argued *supra*, this constituted an

independent violation of Dr. Siddiqui's Sixth Amendment rights.  But it is also

relevant to any determination as to whether Dr. Siddiqui should be held responsible

for any breakdown in communication.  *United States v. John Doe No. 1,*272 F.3d at 122-

23.  For the following reasons, she should not be.

     Upon learning ██████████████████ that the Government of Pakistan was on

the verge of retaining counsel, Dr. Siddiqui objected.  ██████████████████████

████████████████████████████████ Notwithstanding those

objections, on August 10, 2009 retainers were executed and Notices of Appearance

were filed.  At her earliest opportunity, the September 2, 2009 conference, Dr.

Siddiqui told the Court, orally and in writing, that she did not want the services of

those attorneys.  ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████  As she stated

when the matter was again raised at trial, "[The attorneys] are working for other

respected people, not me" (T. 347-48).[14]  Thus, any role Dr. Siddiqui had in the lack

of communication was justified because she made clear from the outset that these

were attorneys that she did not want.

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[14] Dr. Siddiqui saw no material difference between those counsel and Dawn Cardi and
Chad Edgar who were appointed under the Criminal Justice Act.  Attorney Cardi
actively advocated for the retained lawyers' entry into the case and asserted that Dr.
Siddiqui's rejection of them was due to her mental illness.

███████████████████████████████████████

Dr. Siddiqui was left without the advocate that the Sixth Amendment requires. She was forced to accept counsel who were retained by others and that entered the case over her objection.  She was not playing games with the court and its schedule. She protested counsel's involvement as soon as they came into the case.  She asked for time to find lawyers that she could trust.  Her last request for substitution was made two and a half months before the scheduled trial date.  Given the foregoing, the court's refusal to substitute counsel and/or grant Dr. Siddiqui a continuance to seek counsel was an abuse of discretion that violated her Sixth Amendment rights.

## POINT II

## AAFIA SIDDIQUI WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL

The right to counsel guaranteed under the Sixth Amendment includes the right to effective assistance of counsel.  Under the federal Constitution, a petitioner is entitled to a new trial on that ground if she satisfies a two-prong test.  First, she must show that his attorney's performance "fell below an objective standard of reasonableness."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Second, it must be demonstrated that there is a "reasonable probability that but for counsel error, the outcome would have been different."  *Id.* at 694.

Errors by counsel must be considered cumulatively. *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996). Ineffective assistance of counsel may be shown where counsel performs competently in some respects but not others. *Eze v. Senkowski*, 321 F.3d 110, 114 (2d Cir. 2003). However, even a single error by counsel can qualify as ineffective representation if it compromises a petitioner's right to a fair trial. *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986) (citing *United States v. Cronic*, 466 U.S. 648, 657, n.20 (1984)). The same *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Aaparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001). *See also Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).

Defense counsel has a responsibility to investigate or to make a reasonable decision not to investigate law or facts relevant to the case. *Strickland v. Washington*, 466 U.S. at 690-91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*

Counsel's performance fell below professional norms through the following errors. First, during their cross examination of FBI Agent Hurley, counsel failed to utilize available exculpatory evidence that would have destroyed his credibility and reliability. Second, the prosecutor's initial and rebuttal summations were replete with improper comments that shifted the burden of proof. Specifically, the trial prosecutors repeatedly told the jury that in order to acquit they had to find that each

32

of the government eyewitnesses had committed perjury.  With two exceptions, no

objections were lodged and counsel did not move for a mistrial.  Because this error

was "plain" and not raised on direct appeal, Dr. Siddiqui was also denied effective

assistance of appellate counsel.

### Failure To Impeach Agents Hurley And Rosatti

FBI Agent Hurley testified that on July 21, 2008 he conducted a visual

inspection of the room where the shooting incident occurred.  He testified that there

were two holes in that wall "consistent with gunfire damage" (T. 631).  The holes

were close to the ceiling, 7'5" and 7'7" from the floor, respectively (*Id.*).  The holes, he

testified, were "fresh" and their locations "matched" statements made by the

eyewitnesses, including Dawn Card (T. 633).  There were no other holes in the walls

consistent with bullet holes (T. 792).  When shown photographs of the holes, FBI

tool mark examiner Carlo Rosatti opined that they "could be bullet impact holes" (T.

877).

Defense counsel had in their possession evidence that would have conclusively

refuted the prosecution's theory.  On March 18, 2009, the government produced to

defense a CD.  On that CD was a video of a July 17, 2008 press conference

concerning Dr. Siddiqui's arrest.  The press conference was held in the very room

where the shooting incident took place one day later.  Visible on that video are the

two "bullet holes" that government witnesses testified were likely caused by the M4

rifle on July 18.  But clearly, as the holes were in that wall before the July 18 incident, they could not have been caused by the M4.  Counsel did not utilize the video during its cross examination of Agents Hurley and Rosatti.  Indeed, they were only made aware of its exculpatory value when it was pointed out to them by the government shortly before the end of the trial (T. 1649-50).[15]

   A failure to present available exculpatory and impeachment evidence constitutes ineffective assistance where, as here, there is no reasonable reason for not presenting it.  *See Rompilla v. Beard*, 545 U.S. 374 (2005) (failure to investigate and present evidence of mitigation suggested by the record); *Wiggins v. Smith,* 539 U.S. 510 (2003) (same); *Williams v. Taylor* 529 U.S. 362 (2000) (same); *Taylor v. Illinois*, 484 U.S. 400 (1988) (attorney's failure to serve statutory notice of alibi constitutes ineffective assistance unless such conduct is a willful attempt to gain tactical advantage); *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) (impeachment evidence); *Pavel v. Hollins*, 261 F.3d 210, 217-20 (2d Cir. 2001) (unexplained failure to call credible alibi witness cannot be considered reasonable trial strategy); *Berryman v. Morton*, 100 F.3d 1089, 1100 (3d Cir. 1996) (failure to contact potential defense witnesses); *DeLuca v. Lord*, 77 F.3d 578 (2d Cir. 1996) (failure to present defense of extreme emotional disturbance); *Garcia v. Portuondo*, 459 F. Supp.2d 267, 280-81 (S.D.N.Y. 2006) (failure to obtain available exculpatory

---

[15] Trial counsel did not dispute that the video had, in fact, been produced by the government long before the trial.

documents); *Thomas v. Kuhlmann*, 255 F. Supp.2d 99 (E.D.N.Y. 2003) (failure to investigate crime scene)*; Sparman v. Edwards*, 26 F.Supp.2d 450 (E.D.N.Y. 1997), *aff'd.*, 154 F.3d 51 (2d Cir. 1998) (failure to discover and present medical evidence that would have exonerated petitioner).

There was no strategic reason not to utilize the video during the cross examination of Agents Hurley and/or Rosatti.  It supported the gravamen of Dr. Siddiqui's defense, i.e. that there was no physical evidence to corroborate the claim that an M4 rifle was fired on the day of the incident.  Clearly, the video was not used because counsel either did not view it or missed its significance when they did.

### Prosecutorial Misconduct During Summation

Prosecutorial misconduct is a ground for reversal if it causes the defendant "substantial prejudice [by] so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef*, 190 F.3d 71, 78-79 (2d Cir. 1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  Where a prosecutor's remarks during summation constitute "egregious" misconduct, such remarks, standing alone, can deny a defendant due process.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  In assessing whether the comments complained of meet this test, courts consider "the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct." *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1985).

"Prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying." *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987) (citing *United States v. Hestie*, 438 F.2d 131, 132 (2d Cir. 1971)(per curiam)).  *See also United States v. Drummond*, 481 F.2d 62, 64 (2d Cir. 1973); *United States v. Davis*, 328 F.2d 864, 867 (2d Cir. 1964).  This is so because the issue before the jury is not whether the prosecution's witnesses committed perjury but whether the government proved the defendant's guilt beyond a reasonable doubt.  A juror can harbor such a doubt without necessarily concluding that a prosecution witness lied or, as in this case, that the defendant told the truth. *United States v. Richter*, 826 F.2d at 209.

The government's initial and rebuttal summations provide a textbook example of the prosecution's misuse of such an argument.  "To acquit," the prosecutor argued in his opening summation, "you have to find that [the government witnesses] lied to you" (T. 1947).

In the defense's summation, attorney Linda Moreno did not argue that the government witnesses lied.  Rather, she told the jury that the physical evidence that showed that an M4 rifle was not fired in the room, when considered with the inconsistent accounts of the eyewitnesses, necessarily gave rise to a reasonable doubt (T. 1972-73).  The eyewitnesses, she argued were not lying.  They were simply wrong.  She likened their testimony to the 200 or so eyewitnesses to the crash of TWA flight

800, each of whom claimed to see something that did not happen.  "So could 200 people be wrong?  Absolutely.  Could six be wrong?  Yes.  Maybe for different reasons."  (T. 1999).  At no point in her summation did counsel accuse the government eyewitnesses of an intentional falsehood, let alone accuse them of lying under oath.

The prosecutors were taken aback by that argument.  They apparently thought that the defense would accuse the government witnesses of lying, and had prepared a rebuttal whose overriding theme was that in order to acquit, the jury would have to find that each of the soldiers and FBI agents that claimed to have seen Aafia Siddiqui holding a rifle was lying under oath:

> Ms. Moreno just said we're not claiming that all nine lied.  If that is true, that they are not claiming that, that is a huge concession and she is guilty, the defendant is guilty, because they shouldn't specify which one they are saying, which one didn't lie, and I submit to you none of them lied….If one of [the government eyewitnesses] or all of them is telling you the truth then their whole case falls apart.  The whole defense falls apart.  An M4 was fired in that room.  This M4 was fired in that room by the defendant…They have to be saying the defense that those six people if (sic) the room lied.

(T. 2013-14).   And notwithstanding that defense counsel was not claiming that the witnesses lied, the prosecutor pointed out that the defense had not provided a motive for them to lie.  Trial counsel's objection to that argument was overruled (T. 2015).

Continuing in the same vein, the prosecutor further argued that not only would the jury have to find that his witnesses lied in order to acquit, they would have to find that they engaged in a massive conspiracy:

> You know it can't be that they were mistaken.  It has to be that they lied.  And not only that, it is worse than that, it has to be that they all got their stores together, that this is some grand conspiracy to frame the defendant.  You know, like all these guys got together and concluded (sic) and conspired and plotted to convict this one poor little woman.  That is what you would have to believe in order to believe that story.

(T. 2016; See also T. 2036: "you have to believe that all of these people lied").

The prosecutor also told the jury that in order to acquit, they would have to believe Dr. Siddiqui's account over the account of their own witnesses.  "At the end of the day," he told the jury "if you can't believe her over the government's witnesses, then I submit you have to find that she is guilty beyond a reasonable doubt from their testimony."  (T. 2016).  Thus, while he used the term "beyond a reasonable doubt," he told the jury that such a doubt would not be reasonable unless they believed Dr. Siddiqui over their witnesses.  In other words a "reasonable doubt" could only be found if Dr. Siddiqui proved her innocence by a preponderance of the evidence.

The case, according to the prosecutor, rested not on whether the government proved its theory beyond a reasonable doubt.  Instead, it was a swearing contest between defendant Dr. Siddiqui and the government's witnesses:

> Do you believe her or do you believe Captain Snyder?
>> Do you believe her or do you believe Kenny Cook?
>> Do you believe her or do you believe Ahmad Gul?
>> Do you believe her when she flat out lied in your face or do you believe Gary Woodworth from the Braintree Gun Club?
>
>> And if you can't believe her story, you have no reason to disbelieve the government's witnesses, then you should convict her beyond a reasonable doubt of all of the charges.

(T. 2039).

Had the issue been raised on appeal, the conviction would have been reversed even under a plain error standard. The misconduct was "severe." *United States v. Melendez*, 57 F.3d at 241. The improper comments were not isolated; they constituted the overriding theme of the prosecutor's summation. Nor were they made in response to defense counsel's arguments. It was in the prosecution's initial summation where the government first argued that in order to acquit, the jury would have to find that its witnesses lied. With respect to the rebuttal, the prosecutor himself conceded that defense counsel did not characterize the government's witnesses as lying, only that they were mistaken.

The jury was not given curative instructions and both of counsels' objections were overruled.

The misconduct was not harmless. Absent the improper comments, conviction was hardly "certain." *Id.* No one, other than Dr. Siddiqui, was shot in the

39

room.  There was no physical evidence that an M4 was fired by Dr. Siddiqui or even handled by her.  The government's entire case against her rested upon whether the eyewitnesses' accounts were strong enough to satisfy the burden of proof beyond a reasonable doubt.  Arguing that an acquittal would only be justified if the defense proved that all of the government's eyewitnesses committed perjury effectively relieved the prosecution of its burden to prove Dr. Siddiqui's guilt and denied her due process of law.  *In re Winship*, 397 U.S. 358 (1970).

## POINT III

### AAFIA SIDDIQUI'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED WHEN THE PROSECUTION FAILED TO DISCLOSE EVIDENCE THAT SHE HAD BEEN IN UNITED STATES' CUSTODY DURING THE 2003-2008 PERIOD

The prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This duty extends not only to exculpatory material but also information that could be used to impeach a key government witness.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  A defendant is entitled to a new trial where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Where a defendant alleges a *Brady* violation, three elements must be established. First, the evidence must be favorable to the accused either because it is exculpatory or impeaching.  Second, the evidence must have been suppressed by the prosecution either willfully or inadvertently.  Third, the defendant must have been prejudiced.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  *Brady* material must be disclosed in time for its effective use at trial.  *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001).

In March 2003, Dr. Siddiqui, accompanied by her three children, left her mother's home in Karachi, Pakistan with the intention of going to visit with her uncle. She never arrived.  According to news reports, Aafia Siddiqui was in United States' custody and was being questioned by the FBI about alleged ties to *al-Qaeda* (See Exhibits D and E).  A NBC News Report even attributed information about Dr. Siddiqui's detention to "government" sources (See Exhibit F).  The United States Government quickly retracted its statement but did not explain its reasons for doing so.  See "The Intelligence Factory" by Petra Bartosiewicz, *Harper's Magazine*, November 2009.  Dr. Siddiqui remained missing.  She did not reappear until July 17, 2008, when she and one of her children were found wandering the streets of Ghazni, Afghanistan.

Dr. Siddiqui told her initial attorneys that she had been abducted by officials of Pakistani intelligence and eventually turned over to United States' custody.  She was repeatedly interrogated and subjected to physical and psychological torture.  She

remained in custody, separated from her children she told her attorneys, for the next five years.

The government maintained that it had no "hard" evidence that Dr. Siddiqui had been in United States' custody at any time during the years 2003-2008. The evidence it did have, the government represented, was "classified" (T. 11-19-08, p. 7-10). And despite the fact that counsel had been cleared to review the classified evidence, the government refused to turn it over.

After the trial, evidence came to light that the prosecution knew, or should have known that Dr. Siddiqui had in fact, been in United States' custody during the missing five years. On or about April 20, 2010 (after the verdict but before sentencing), Syed Bilal, a United States citizen, attended a dinner at the home of his friend. Among the guests was Imran Shaukat. Shaukat identified himself as the Superintendent of Police in Pakistan's Sindh Province. Over the course of the evening and the following evening, Shaukat told Bilal that in 2003, while working for the security forces in Pakistan, he had personally taken part in the arrest of Aafia Siddiqui. According to Shaukat, Dr. Siddiqui was arrested at the request of the Federal Bureau of Investigation (FBI). After her arrest, Dr. Siddiqui was turned over to American agencies. The conversation between Bilal and Shaukat on the second evening was secretly recorded. During the conversation, Shaukat repeated his admission that it was he who abducted Dr. Siddiqui and her children. While the

reappearance of Dr. Siddiqui's daughter had only been publicly disclosed a couple weeks before the recording, Shaukat stated that he knew that the daughter had already been in Pakistan for several months.

Under *Brady*, the prosecution is chargeable with knowledge of information in the possession of the investigating agency, in this case the FBI.  *Kyles v. Whitley*, 514 U.S. at 437.  According to Shaukat, it was the FBI who actually requested that Dr. Siddiqui be detained.  Thus, the prosecution is legally responsible for the fact that the information was kept from Dr. Siddiqui's defense team at trial.

Dr. Siddiqui was prejudiced by the non-disclosure of evidence about the missing five years.  In *Kyles*, the Court stressed that a reasonable probability of a different result

> does not require demonstration by preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal...[but by a]showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict..

*Id.* at 434.  While materiality is assessed in light of the evidence adduced against a defendant at trial, *Leka v. Portuondo*, 257 F.3d at 104; *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998), a reasonable probability of a different result is not a "sufficiency of the evidence test:"

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to

> convict.  The possibility of an acquittal on a criminal charge
> does not imply an insufficient evidentiary basis to convict.
> One does not show a *Brady* violation by demonstrating that
> some of the inculpatory evidence should have been
> excluded, but by showing that the favorable evidence could
> reasonably be taken to put the whole case in such a
> different light as to undermine confidence in the verdict

*Kyles v. Whitley*, 514 U.S. at 434-35.

Had the information been disclosed, it is "reasonably probable" that the result of the proceedings would have been more favorable to Dr. Siddiqui.  First, if the defense could have shown that Dr. Siddiqui had been detained for five years and released from custody shortly before July 18, the evidence would have been placed in a different light.  The government attempted to portray Dr. Siddiqui as someone who had just come from a terrorist camp intending to commit a terrorist act either in Afghanistan or the United States.  That theory would have been impossible to argue if it was shown that  Dr. Siddiqui had been secretly imprisoned for five years and released only days before.

Second, it is likely that Dr. Siddiqui would not have been deemed competent to stand trial at least until she had received treatment for severe PTSD as a result of her having been abducted, separated from her children and held incommunicado for five years.  Critical to the determination that she was competent was the conclusion of at least one examiner that she was malingering or feigning mental illness.  If it was verified that she was, in fact, detained for five years and physically and psychologically

abused during that period, those medical professionals would likely have reached a different conclusion.

Third, Dr. Siddiqui's trial testimony would have been different and viewed in a different light.  If she had evidence to corroborate her account, Dr. Siddiqui would have described her 2003 arrest, her five years in custody and the events leading up to her July 17 arrest in Ghazni.  Her testimony about a "secret prison" (elicited during cross examination) was likely viewed by the jury as a desperate attempt to obfuscate.  If the jury knew that her testimony about those five years was true, it would have bolstered the credibility of her account of what happened in the room on July 18.

Finally, the evidence concerning Dr. Siddiqui's five year detention would have been powerful mitigation evidence at sentencing.  Had the court been aware that Dr. Siddiqui had been abducted, separated from her children and held against her will for five years, it would have placed her alleged actions on July 18, 2008 in a whole different context.

Should this Court determine that the information concerning Dr. Siddiqui's 2003 disappearance was not suppressed by the government and, therefore, not a *Brady* violation, it would then constitute an instance of ineffective assistance of counsel. Counsel Cardi remained Dr. Siddiqui's CJA appointed counsel on direct appeal.  She was provided with the transcript of the recorded conversation in or about February

2011 by attorney Tina Foster.  At that point, counsel could still have filed a motion

for a new trial pursuant to Fed. R. Crim. P. 33 based upon newly discovered evidence.

She did not do so, thereby violating Dr. Siddiqui's Sixth Amendment

rights.**CONCLUSION**

      **WHEREFORE**, for all of the above reasons, this Court should issue an order:

    a.  Vacating Aafia Siddiqui's judgment of conviction or, alternatively,

    b.  ordering an evidentiary hearing on the claims raised by this motion and

    c.  granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
    May 12, 2014                Respectfully submitted,

                        ROBERT J. BOYLE
                        351 Broadway
                        3rd floor
                        New York, N.Y.  10013
                        (212) 431-0229
                        Rjboyle55@gmail.com
                        Attorney for Aafia Siddiqui

Of counsel:

TINA FOSTER, ESQ